## THE RICHMOND CORPORATION *v.* BOARD OF COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY, MD.

[No. 259, September Term, 1968.]

*Decided June 25, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Kenneth E. Pruden,* with whom was *George T. Burroughs* on the brief, for appellant.

*Barry S. Cramp,* with whom were *Lionell M. Lockhart, Harry L. Durity, James J. Lombardi, Martin Hertz, James F. Sharkey, Albert J. Lochte* and *Emil A. Nichols* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellee, the Board of County Commissioners for Prince George's County, sitting as a District Council (District Council), denied the applications of The Richmond Corporation, appellant, for special exceptions (a) for a gasoline filling station in a C-1 (local commercial) zone and (b) for an automobile parking compound in an R-R (rural residential) zone on a tract of land bounded in part by Riggs Road, Powder Mill Road, Metzerott Road and Adelphi Road in Prince George's County. The Circuit Court for Prince George's County (Meloy, J.) sustained the District Council's action and from the order of that court affirming the action of the District Council, the present appeal was timely taken.

The subject property consists of approximately eight acres of land. The northerly and westerly boundaries front on both Powder Mill Road and Riggs Road for an approximate distance of 1050 feet, divided almost evenly between the frontage on the two roads which curve into each other along the subject property. On the northeast, the property is bounded by Adelphi Road for an approximate distance of 120 feet; on the south, by Metzerott Road for an approximate distance of 690 feet; and, on the east, for an approximate distance of 615 feet by properties not owned by Richmond. Approximately one-half of the subject property (the northerly half) is zoned C-1 for commercial use and is presently improved with a drug store, a High's store and a "7-11" store. Several other commercial buildings are proposed for construction. The southerly half of the subject property is zoned R-R.

Richmond assembled the whole tract by the purchase of

six separate parcels of land. It purchased the land zoned C-1 in March of 1961, and two other parcels during that year. It acquired one parcel in May 1963 and the last parcel on June 24, 1966, completing the assembling of the land on that date. Its investment in the subject property was approximately $400,000.00.

Subsequent to the completion of the assembling of the land in 1966, Richmond filed an application (No. A-5314) to change the then existing residentially zoned land to the C-2 zone. The District Council had a hearing on this application on November 23, 1966, took testimony and continued the hearing to a later date. The hearing was resumed on January 18, 1967, and the matter was taken under advisement by the District Council. The District Council denied this application on May 16, 1967.

After this action on May 16, 1967, by the District Council, Richmond had its development plans redrawn and renegotiated its leases for the shopping center to be constructed. These plans were drawn in order to use the land zoned R-R as a parking lot in connection with the proposed shopping center to be erected on the land zoned C-1, which at that time was a permitted use of R-R land under the Prince George's County Zoning Ordinance. On October 3, 1967, however, an ordinance was duly passed which required that a special exception be obtained in order to use residentially zoned land adjacent to land zoned commercial as a parking compound.

Thereafter, on October 24, 1967, Richmond prepared four applications for special exceptions as follows:

| Zoning number of application | Zoning classification | Proposed use |
|---|---|---|
| No. 1648 | C-1 | Automobile Filling Station |
| No. 1649 | C-1 | Theater |
| No. 1650 | R-R | Automobile Parking Compound |
| No. 1651 | C-1 | Dry Cleaning Plant—Retail |

These applications were received by the District Council on November 20, 1967. The subject property was inspected by the zoning inspector of the County's Department of Inspections and Permits on December 4, 1967, and the Department reported to the District Council on December 8, 1967. It recommended favorable consideration of Application No. 1648 (for the filling station), upon certain stipulations. In regard to Application No. 1650 (for the automobile parking compound) it stated that unless the three special exceptions requested by Richmond were granted "there would be no apparent need for the parking compound." If there were approval of the special exception for the parking compound, the Department recommended submission to the Maryland-National Capital Park and Planning Commission (Planning Commission) within 30 days for approval, plans for the erection of a fence, planting of adequate shrubbery or screen planting, etc.

On January 12, 1968, the Planning Commission reported to the District Council in regard to all four applications which it had considered as a group. The report stated in relevant part:

"Although the automobile filling station is proposed to be located on the same commercially zoned parcel, its site plan and eventual development does not depend upon the remainder of the proposed commercial shopping center. As a result, the Planning Board voted to recommend the approval of the automobile filling station in accordance with Section 28.317 of the Prince George's County Zoning Ordinance, subject to the submission of a satisfactory site plan.

"We discussed at considerable length the implications of the proposed use of a large tract of land zoned for residential use for commercial parking in conjunction with the proposed shopping center. The site plan, as submitted, indicates the dependence of the proposed shopping

center upon the residential land for parking. The Planning Board, after the discussion, voted to recommend the denial of the Automobile Parking Compound citing the following reasons:

"1. The application is not in accordance with Section 28.2 (a), (b), of the Prince George's County Zoning Ordinance, which refers to the General Provisions for Special Exceptions.

"2. The application implies the circumvention of the zoning and land use pattern by effectuating the enlargement of 3.3± acres of commercially zoned land to over 8 acres of commercial use in reality.

"3. Commercial traffic from this center should be oriented to Riggs and Adelphi Roads, as proposed on the Master Plan, not Metzerott Road.

"4. This application is in direct conflict with the decision of the District Council concerning a commercial zoning request (Zoning Map Amendment Petition A-5314) which was denied on May 16, 1967.

"As a result of the dependence of the automobile parking compound and the overall site development plan of the proposed center, the Special Exception Applications for the Retail Dry Cleaning Store and Plant and the Theatre are not recommended as submitted. The Planning Board voted instead to recommend that these applications have their site plans revised to incorporate all parking requirements within the commercially zoned land at which time, and only then, be considered in accordance with Sections 28.3221 and 28.339 respectfully [sic] of the Prince George's County Zoning Ordinance."

All four applications came before the District Council on January 17, 1968, were consolidated for hearing and after a hearing, all of the applications were denied.

At the hearing, a representative of Safeway Food

Stores testified for Richmond that Safeway had negotiated a lease with Richmond for 22,500 square feet of building space in a portion of the northern one-half of the subject property zoned C-1; that a study of the area made by Safeway indicated that within a one mile trading area the population was just under 12,000 persons as of 1967 and was estimated to be 15,000 in another three years; that the lease was contingent upon approval of the plans and specifications including those for the parking compound; and, that if the parking compound were unavailable, Safeway would not be interested in going forward with the lease.

Various expert witnesses testified for Richmond in regard to the suitability of the subject property for commercial development and the need for such development in view of the growth of population in the area. They testified that it was necessary to provide parking for the contemplated commercial construction and that, with the straightening of Adelphi Road there was a good traffic pattern. A representative of the Texaco Oil Company testified that the proposed gas station would not generate any other traffic patterns than those presently existing; that there was no service station within three miles from the subject property going north on Riggs Road and in the other direction, there were no service stations within a mile and one-half; that going west on Metzerott Road there was no service station until one reached New Hampshire Avenue over two miles away; and, that going northeast or southwest on Adelphi Road there were no service stations. He also testified that within a mile of the site for the proposed service station there were 15,000 people and there was a need for a service station at the site.

A number of neighboring property owners testified in opposition to the application. They pointed out the adverse effect on the existing difficult traffic situation, the annoyance that would result from the proposed theater, the depreciation in the value of their properties and the adverse impact the proposed commercial uses would have

upon the one-family dwellings in the neighborhood. They testified that there are three churches in the immediate neighborhood, a Friends' Meeting House, a Seventh Day Adventist Church and a large Roman Catholic Church, high school and Convent. Mother Cora testified that the value of the church, high school and convent was approximately $1,000,000 and that the complex would be injured by the increased traffic as well as by the commercialization of the area. The Adelphi Community Association voted unanimously to oppose the applications for the parking compound and for the service station.

At the conclusion of the hearing, Commissioner Brooke moved that all four applications be rejected. He stated:

"I move that Applications Numbers 1648, 1649, 1650, and 1651 of the Richmond Corporation, requesting special exceptions for an automobile filling station, a theater, an automobile parking compound, and a dry cleaning store-plant (retail), be denied, because of the traffic hazards and conditions that their approval would create. It would tend to make this parking compound of a commercial nature and one which would face directly into the single-family homes of the neighborhood, having a tendency to destroy their value as well as their usefulness, and that the amount of commercial land that is already there can be used aptly by the owner, who knew full well when he bought it how much it was and what it could be used for; further, that the granting of the special exceptions would tend to destroy a neighborhood that is completely built up with nice homes. Also, that the roads could not be used in the manner which is customary with shopping centers, because Riggs Road is a neighborhood road now and will continue to be so because of the agreement this County has with the State Roads Commission in regard to its rehabilitation.

"(Vice Chairman Francois) I second the motion. In respect to the filling station, we should add that because of the traffic problem involved, we do not agree with the favorable recommendation of the Park and Planning Commission.

"(Commissioner Brooke) I accept that amendment to my motion."

The motion passed unanimously; Commissioner Aluisi not being present, did not vote.

The appeal to the Circuit Court was taken only in regard to the denial of Applications No. 1648 (automobile filling station), No. 1650 (automobile parking compound) and No. 1651 (dry cleaning plant-retail). The denial of Application No. 1649 (theater) was not appealed and therefore was abandoned.

As we have indicated, the trial court affirmed the order of the District Council on Applications Nos. 1648, 1650 and 1651 and filed a written opinion giving its reasons for its conclusions. The trial court's ruling on Application No. 1651 (dry cleaning plant-retail) was not mentioned in Richmond's brief or at the argument, so that the denial of this application is also abandoned by the appellant. *Harmon v. State Roads Commission*, 242 Md. 24, 28-32, 217 A. 2d 513, 515-17 (1966); *Bishop v. Board of County Commissioners of Prince George's County*, 230 Md. 494, 500, 187 A. 2d 851, 854 (1963). Only the denial of the filling station and parking compound applications are before us on this appeal.

Richmond makes two contentions before us:

1. The trial court erred in not holding that Richmond had a vested right in the use of the proposed parking compound.

2. The trial court erred in not holding that the denial of the special exceptions for the proposed parking compound and the proposed service station was unreasonable, arbitrary and capricious.

In our opinion the trial court did not err in either regard and its order of August 23, 1968, shall be affirmed.

## (1)

In its argument in support of its contention that it had a vested right to use the R-R zoned land as a parking compound, Richmond points out that prior to October 3, 1967, when the zoning law was amended to require a special exception, it had a lawful right to use that land as a parking compound in connection with its adjacent commercially zoned property. Richmond claims that it relied upon the right to this use by expending large amounts of money in assembling the tract. Further relying on this right, after its application to rezone the land to C-2 had been denied on May 16, 1967, Richmond proceeded to change its position in a material and expensive way by preparing plans, leases, and specifications for the erection of a shopping center on the C-1 land, with the adjacent R-R land to be used for the permitted parking purposes. It also argues that, but for the delay by the District Council in deciding the zoning case in Application No. A-5314 for the C-2 zoning (approximately six months), Richmond would have perfected its plans and would have had its building permit prior to the enactment of the new ordinance on October 3, 1967, and that if the application for the special exceptions for a parking compound should be denied by the District Council, Richmond could not build the shopping center.

Chief Judge Hammond, for the Court, aptly stated in the recently decided case of *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 254 A. 2d 700:

> "A property owner has no vested right in the continuance of the zoning status of his or neighboring property, merely the right to rely on the rule that a change will not be made unless it is required for the public good. *Wakefield v. Kraft,* 202 Md. 136, 144."

In *Mayor and City Council of Baltimore v. Shapiro,* 187 Md. 623, 51 A. 2d 273 (1947), the land owners had acquired a property on Frederick Avenue in Baltimore

City consisting of approximately 14½ acres, unimproved except for four buildings fronting on Frederick Avenue on April 28, 1941, for the purpose of using the unimproved portion of the tract for the sale of used cars, used parts and for the dismantling of used cars. The tract at that time was in a second commercial use district in which the proposed use was allowed. On June 18, 1941, the owners applied for a permit for the use mentioned and obtained a permit for that use on July 2, 1941. Except for casual and sporadic activity, the tract was not used for the purpose mentioned in the permit prior to December 12, 1941, when the Baltimore City Zoning Ordinance was amended to prohibit "automobile dismantling, salvaging or wrecking yard, and yard for the dismantling and salvaging of automobile parts." The Board of Municipal and Zoning Appeals sustained the Zoning Commissioner who revoked the permit, but this decision of the Board was reversed by the Baltimore City Court which held that the permit of July 2, 1941, was "valid and subsisting." In reversing the order of the Baltimore City Court and reinstating the order of the Board holding that the permit was invalid and properly revoked, Judge (later Chief Judge) Henderson, for the Court, stated:

> "As against this evidence, residents testified that no cars were ever dismantled on the lot. While this negative evidence is not entitled to much weight (*Heath v. Mayor and City Council of Baltimore*, 187 Md. 296, 49 A. 2d 799, 803), it shows that the activity failed to meet the test of being 'known in the neighborhood.' Accepting the evidence produced by the appellees at its face value, the activity appears to have been merely preliminary or casual. Neither the existence of a plan (*Chayt v. Board of Zoning Appeals, supra*) nor the purchase of property and the expenditure of money for grading (*Knox v. Mayor and City Council of Baltimore, supra; Board of Com'rs of Anne Arundel County v.*

*Snyder*, 186 Md. 342, 46 A. 2d 689, 692) are sufficient to show that the business was established or existing. The mere issuance of a permit, where the permittee has not commenced the work or incurred substantial expense on the faith of it, does not create a vested right, or estop the municipal authorities from revoking it. *Board of Com'rs of Anne Arundel County v. Snyder, supra; Geneva Inv. Co. v. St. Louis*, 8 Cir., 87 F. 2d 83, *certiorari* denied 301 U. S. 692, 57 S. Ct. 795, 81 L. Ed. 1348; *Brett v. Building Commissioner of Brookline*, 250 Mass. 73, 145 N. E. 269; and see Note, 138 A.L.R. 500, and cases there cited. After the adoption of the amendment, the issuance of a new permit, for a non-conforming use, would be nugatory and void. *Lipsitz v. Parr*, 164 Md. 222, 164 A. 743." (187 Md. at 634-35, 51 A. 2d at 279.)

In our opinion the *Shapiro* case is dispositive of the first contention of Richmond. In *Shapiro*, the land owners had not only purchased the tract for the express purpose of engaging in a permitted use under the provisions of the existing zoning law, but they had actually *applied for and received* a permit to engage in that permitted use some five months *prior* to the amendment of the zoning ordinance prohibiting the use. In the present case, no permit was applied for and no permit was issued. *Nothing was done* on the land involved in this case which would give notice to the neighborhood that a parking use was, or would be, made. In Maryland it is established that in order to obtain a "vested right" in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being de-

voted to that use. See *Feldstein v. LaVale Zoning Board,*
246 Md. 204, 210, 227 A. 2d 731, 734 (1967), indicat-
ing that *Shapiro* as well as *Chayt v. Board of Zoning Ap-
peals,* 177 Md. 426, 9 A. 2d 747 (1939), established as
one of the tests for determining the existence of a non-
conforming use "is whether such use was known in the
neighborhood." Cf. *Alpha Enterprises, Inc. v. Cameron,*
253 Md. 49, 251 A. 2d 582, 584 (1969), in regard to what
constitutes the "commencement of construction" under a
contract. In the recent case of *Ross v. Montgomery
County,* 252 Md. 497, 250 A. 2d 635 (1969), we reaf-
firmed the principles enunciated in the *Shapiro* case, and
held that where the property owner, to whom a permit
had been issued, had not in good faith begun construc-
tion, he did not have a valid building permit, and the fact
that he had expended large amounts of money in acquir-
ing the property and for architectural fees gave him no
vested rights to prohibit the operation of a zoning amend-
ment. It is apparent that the present case in which no
permit was issued and no construction of any kind had
been begun is well within our holding in *Ross.*

We do not find it necessary to rule in the present case
upon whether or not administrative action, which unduly
delays a property owner in making application for, or in
obtaining a permit, in order to allow the passage of an
amendment to the existing zoning ordinance making un-
lawful a previously contemplated lawful use, may estop
the municipality from prohibiting the contemplated use
pursuant to such an amendment. Even if we assume, *argu-
endo,* that this rule were applicable under proper circum-
stances, the facts in the present case are not sufficient to
invoke such a rule. In the case at bar, approximately four
and one-half months elapsed from the time the District
Council denied the previously requested C-2 zoning on
May 16, 1967, until the passage of the amendment to the
zoning ordinance on October 3, 1967, requiring a special
exception for the previously permitted use. As early as
January 18, 1967—the date of the continued hearing on
Application No. A-5314 for the C-2 zoning—Richmond

was aware that there was a suggestion by one of those opposed to the parking compound use of the land zoned R-R, that the zoning ordinance should be amended to require a special exception for such a use. Under these circumstances, there was ample time in which Richmond could have perfected its plans and specifications for the proposed shopping center, and have made application for and obtained a permit for the then lawful use. It also had time prior to the passage of the amendment to the zoning ordinance to have begun construction sufficiently on the parking compound, to have advised the neighborhood that the R-R land was devoted to the parking compound use. Instead of doing these things whereby it would have obtained a "vested right" to use the R-R land as a parking compound, it waited until *after* the amendatory ordinance was passed and became effective and *then* presented its four applications for special exceptions already mentioned. These were filed *pursuant* to the zoning ordinance, *as amended,* thereby recognizing, in effect, that Richmond considered it necessary to obtain from the District Council, the special exceptions required by the zoning ordinance as amended. These actions are inconsistent with the present contention that Richmond *already had* a "vested right" to proceed with the use of the R-R land as a parking compound without obtaining a special exception permitting such a use. In short, the facts in the present case would not raise an "estoppel" against the county, even if the doctrine of "estoppel" were available in a proper case.

Richmond relies upon the decisions of our predecessors in *Northwest Merchants Terminal, Inc. v. O'Rourke,* 191 Md. 171, 60 A. 2d 743 (1948) ; *Amereihn v. Kotras,* 194 Md. 591, 71 A. 2d 865 (1950) and *Kracke v. Weinberg,* 197 Md. 339, 79 A. 2d 387 (1951), and also upon decisions in several sister states which, Richmond argues, indicate a change of thought in those courts in regard to when a land owner obtains a "vested right" in a particular use of land or perhaps more accurately, in regard to some of the decisions, when the municipality is es-

topped by equitable considerations, from insisting that a subsequently passed rezoning ordinance prevents the land owner from proceeding with the previously permitted use.

The decisions of this Court relied on by Richmond are readily distinguishable from the present case. In *Northwest Merchants Terminal* a tract of land which bordered the tracks of the Western Maryland Railroad in Baltimore City and which had been zoned second commercial for fifteen years, was purchased in order to erect storage warehouses permitted under the existing zoning. Prior to the rezoning of the land to a residential use district, the owner had obtained from Baltimore City an occupational permit for storage of government surplus materials, and later obtained a grading permit. The land was cleared of rubbish and trees, the undergrowth dug up and burned and solid fill was brought in and leveled off. Cement work was done, electricity put in an existing shed under a permit received from the municipality, and upon application by the property owner, water and sewers were installed on part of a nearby street by the municipality. The shed was filled with building materials and equipment. Also prior to the adoption of the rezoning ordinance, the owner filed three applications for permits to build three warehouses and these permits were issued. The owner had expended approximately $50,000 (including the purchase price of the land of $12,500) for the improvement of the property and in preparation for building. After construction had been temporarily held up by action of the Civilian Production Administration, the neighboring property owners filed a bill in equity for an injunction and a declaration that the permits were void. This Court held that under the evidence, the rezoning of the triangular portion of land next to the railroad right-of-way was unreasonable, arbitrary and capricious in that the conclusion to rezone the area to residential zoning was not "fairly debatable" and was void so far as that area was concerned.

It will be observed that in the *Northwest Merchants*

*Terminal* case, the owner had not only applied for and received its permits prior to the passage of the rezoning ordinance, but had done considerable work in reliance on the permits prior to the passage of the rezoning ordinance, which is not the situation in the instant case. In addition to this important distinction, the ordinance itself was held to be unreasonable, arbitrary and capricious as it related to the area in which the owner's land was located. As we shall point out later, the ordinance involved in the present case is not arbitrary, unreasonable or capricious.

In *Amereihn v. Kotras, supra,* the owner had obtained a permit to erect a building for the manufacture of building materials. Prior to the passage of the original zoning ordinance in Baltimore County, the owner had proceeded to erect the building and had it under roof when the ordinance was passed. This Court held that the owner had a nonconforming use which was a vested right and entitled to constitutional protection. Here again the owner had applied for a permit, engaged in construction under the permit and acquired a nonconforming use.

In *Kracke v. Weinberg, supra,* the land in question had been originally zoned second commercial and industrial by the original comprehensive zoning ordinance in Baltimore City, Ordinance No. 1247, approved March 30, 1931. This property was near railroad tracks but was rezoned to a residential use district in 1946. The evidence showed that it would be impossible to use the land for residential uses. In a suit for a declaratory decree, that the rezoning ordinance was invalid and void, this Court held that the rezoning of the land was arbitrary, unreasonable and capricious and also resulted in an unconstitutional taking of the property for public use without the payment of just compensation. The latter ground of invalidity of the rezoning ordinance involved in the present case is not raised and as we have observed, in our opinion, the rezoning ordinance in the instant case is not arbitrary, unreasonable or capricious.

In summary, all of the prior Maryland cases cited by

and relied upon by Richmond are clearly distinguishable from the case at bar.

Turning now to the decisions of other states, we find some conflict in the authorities in regard to when and under what circumstances a vested right arises for a contemplated use of land in accordance with existing zoning or whether an estoppel arises against the municipal authorities to enforce a rezoning ordinance prohibiting the intended use.

The numerous cases and the conflicting rules are carefully considered in 2 Rathkopf, *The Law of Zoning and Planning* (3d Ed.), Chapter 57, entitled, *Rights Resulting from Valid Permit or Rights Thereto,* pages 57-1 to 57-52. It would serve no useful purpose and would unduly prolong this opinion to attempt to consider and evaluate the specific cases from other states cited in the briefs and considered by Rathkopf in Chapter 57. The majority rule is stated by Rathkopf to be as follows:

> "It is generally held that neither the filing of an application for a building permit nor the issuance of a building permit, although valid and issued in conformity with the provisions of the zoning ordinance, alone confers any rights in the applicant or permittee as against a change in the zoning ordinance which imposes further limitations upon the use or structure proposed. As a matter of dicta, some courts have stated that the amendment of the ordinance constitutes, ipso facto, a revocation of any permit for a use or structure prohibited by the amendment.
>
> "Where the landowner has done nothing subsequent to obtaining the permit, he is usually held to be bound by any change in the zoning ordinance even if its effect is to nullify the permit." (Rathkopf, *supra,* at 57-2 to 57-4.)

As we have indicated, the prior decisions of this Court follow the majority rule. See *Ross v. Montgomery County,*

*Feldstein v. LaVale Zoning Board,* and *Mayor and City Council of Baltimore v. Shapiro,* all *supra.*

The minority rule is stated as follows:

> "There are, however, several jurisdictions in which the rule stated above is not followed. 'Notwithstanding the weight of authority,' the Supreme Court of Washington held that the rule in that jurisdiction is that the right to a permit vests when applied for, if consistent with the building codes and ordinances in effect at the time the application is made, and that there was no requirement that the permittee change his position in reliance on the permit before the zoning ordinance is enacted or amended so as to make illegal the use contemplated under the permit." (Id. at 57-4.)

A minority of states has begun to hold that in certain circumstances, substantial expenditures made *prior* to the obtention of a permit or even in reliance upon *the probability of its issuance,* may be sufficient to hold that the land owner has acquired a "vested right" in the contemplated use under the existing zoning. The reason for this change in judicial viewpoint is stated to be:

> "The requirements of zoning ordinances and building codes, particularly in urban and suburban areas, are so strict and so detailed that even to make application for a permit involves the expenditure of considerable sums of money for surveys, soil-bearing tests, architects' plans and specifications. The larger the project contemplated, the greater the expense and the more time involved in complying with the conditions precedent to filing for a permit." (Id. at 57-10.)

This minority view has now been adopted in Illinois (see *Cos Corp. v. City of Evanston,* 27 Ill. 2d 570, 190 N.E.2d 364 (1963)) and possibly in New Jersey (see

*Sgromolo v. City of Asbury Park,* 134 N.J.L. 195, 46 A. 2d 661 (1946), but see *Morris v. Postma,* 41 N. J. 354, 196 A. 2d 792 (1964) and *Tremarco Corp. v. Garzio,* 32 N. J. 448, 161 A. 2d 241 (1960)).

Several cases hold that where there is wilful delay by the administrative officials in issuing a permit for which a valid application has been made prior to the adoption of the amending ordinance, and the owner has expended substantial money relying on the existing zoning, the permit will issue notwithstanding the amendatory ordinance and the owner will be permitted to use the land pursuant to such a permit. See *Alexander v. City of Minneapolis,* 267 Minn. 155, 125 N.W.2d 583 (1963); *Humble Oil & Refining Co. v. Worthington,* 267 N.Y.S.2d 794, 49 Misc. 2d 432 (1966). See Rathkopf, *supra,* at 57-36 to 57-49.

As we have indicated, the facts in the present case do not indicate any wilful delay on the part of the District Council or the administrative officials or the existence of any other factors which would require the application of the doctrine of estoppel, if that doctrine were otherwise applicable. As we have stated, we express no opinion in regard to this question.

(2)

In our opinion, the denial of Richmond's applications for special exceptions for the parking compound and for the gasoline filling station was not unreasonable, arbitrary and capricious.

Richmond does not challenge the general validity of the Ordinance, passed October 3, 1967, requiring a special exception for the use of residentially zoned land adjacent to commercial property as a parking compound, but rather challenges the application of that ordinance to its parking application, contending that there was no substantial evidence to justify the denial of the application. It also contends that there was no substantial evidence justifying the refusal of application for the gasoline filling station. We do not agree with these contentions.

Section 28.2 of the Zoning Ordinance of Prince George's County provides:

"A special exception may be granted when the council finds that:

"(a) The proposed use is in *harmony with the purpose and intent of the General Plan* for the physical development of the District as embodied in this ordinance and in any Master Plan or portion thereof adopted or proposed as part of said General Plan.

"(b) The proposed use will not *affect adversely the health and safety* of residents or workers in the area and will not be detrimental to the use and/or development of adjacent properties or the general neighborhood." (Emphasis supplied.)

In *Board of County Comm'rs for Prince George's County v. Luria,* 249 Md. 1, 3, 238 A. 2d 108, 109 (1968), we held that these are separate and distinct requirements which must be found by the District Council to exist before a special exception may be granted. These respective findings of the District Council must be supported by substantial evidence and the burden of establishing these requirements is upon the applicant. We cited *Luria* with approval and followed it in *Board of County Comm'rs for Prince George's County v. Lightman,* 251 Md. 86, 90, 246 A. 2d 261, 263 (1968).

There was no sufficient evidence produced by the applicant, Richmond, that either the parking compound or the gasoline filling station were in *harmony with the General Plan.*

In the Planning Commission's letter to the District Council of January 12, 1968, that Commission recommended a *denial* of the application for the parking compound. It recommended approval of the application for the automobile filling station subject to the submission of a satisfactory site plan but did not state that the proposed use was in harmony with the General Plan. Nor

did the recommendation of the Department of Inspection and Permits in its letter to the District Council recommending favorable consideration of the automobile filling station state that this use was in harmony with the General Plan but that it "would provide a convenience to the neighborhood." Nor did Mr. Beard, the real estate expert who testified for Richmond, state that in his opinion the proposed uses were in "harmony with the purpose and intent of the General Plan," and, of course, no reasons were stated in support of such an opinion. He was asked whether or not he felt "that the proposed uses are in harmony with what exists physically in the area" and he replied, "I certainly think so," but this neither expresses an opinion on the essential statutory requirement nor gives any reasons for such a conclusion. See *Luria, supra.*

Even if the Planning Commission and the Department of Inspection and Permits *had* rendered an opinion that the uses, or any of them, were in harmony with the purpose and intent of the General Plan, the District Council would not have been bound by such opinions. *Cf. Mayor and City Council of Baltimore v. Muller,* 242 Md. 269, 279, 219 A. 2d 91, 97 (1966).

In regard to the second requirement that the proposed use would not adversely affect the health and safety of residents or workers in the area, six witnesses for the protestants testified that the proposed construction and uses would adversely affect their safety by the increase in traffic, noise and other nuisance. Mr. Beard, who testified for Richmond, stated that the proposed construction and uses would not affect the traffic pattern or traffic ordinance. Although he qualified as a real estate expert, no attempt was made to qualify him as a traffic expert, so that the District Council could well take that into account in evaluating his testimony. Then too, he gave no reasons for his opinion in this regard and we have held that an expert's testimony is of no greater value than the reasons given to support it. *Luria, supra.* (249 Md.

at 4, 238 A. 2d at 110) ; *Greenblatt v. Toney Schloss Properties Corp.*, 235 Md. 9, 12, 200 A. 2d 70, 72 (1964).

It appears, therefore, that not only did Richmond fail to meet its burden to establish either of the two essential statutory requirements for the granting of the special exceptions, but in regard to the second requirement, there was ample evidence to support the finding of the District Council that traffic hazards would be created if the applications were granted, so that this issue was at the least "fairly debatable." Being fairly debatable, the courts should not substitute their judgment on this issue for the decision of the District Council. *Ark Readi-Mix Concrete Corp. v. Smith*, 251 Md. 1, 4, 246 A. 2d 220, 221-22 (1968) and prior Maryland cases cited in the opinion in that case.

*Order affirmed, the costs to be*
*paid by the appellant.*