## MALMAR ASSOCIATES *v.* BOARD OF COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY

[No. 173, September Term, 1970.]

*Decided January 6, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Lance W. Billingsley* for appellant.

*Albert J. Lochte, Associate County Attorney,* with whom were *Lionell M. Lockhart, County Attorney, Harry L. Durity, Deputy County Attorney,* and *James F. Sharkey, Associate County Attorney,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

In this appeal in a zoning case, the appellant, Malmar Associates (Malmar or Applicant) challenges the Order of February 26, 1970, of the Circuit Court for Prince George's County (DeBlasis, J.) sustaining the findings and resolution of the appellee, Board of County Commissioners for Prince George's County, sitting as a District Council (District Council) denying the applicant a Spe-

cial Exception to the Zoning Ordinance of Prince George's County as amended by Ordinance No. 380, approved October 1, 1968, in regard to maximum percentages of two, three or more bedrooms per apartment unit in various multiple-family, residential zones. The principal questions presented to us are whether the District Council's action (1) was in accordance with the provisions of the zoning ordinance itself; (2) was arbitrary and capricious; (3) Ordinance No. 380, itself, is unconstitutional and void as being (a) an impairment of a vested right by retroactive application, (b) based on an unreasonable restriction of private property, unrelated to the general welfare and (c) a denial of equal protection of the laws?

Malmar owned a parcel of land in the Thirteenth Election District of Prince George's County in Glenarden which was in the R-18 (Multiple-Family, Medium-Density Residential) zone. It planned to develop the land by erecting apartment buildings on three sections. Section 1 was fully developed before the passage of Ordinance No. 380. For the erection of the apartment buildings on Section 2, a special exception under Ordinance No. 380 was needed. Malmar applied for this special exception for Section 2 and it was granted by the District Council.

The apartment buildings were under construction in Section 2 at the time of one of the hearings before the District Council on July 16, 1969.

Malmar applied for the special exception for Section 3 ("Parcel C") — the special exception involved in the present case — on April 14, 1969. Section 3 consists of 10.276± acres (447,622.56 square feet) and is in Glenarden, north of Hamlin Street and approximately 300 feet west of Brightseat Road. Under the applicable zoning, 223 apartment units are permitted and the applicant proposed to have that number in 19 apartment buildings, made up of 12 four bedroom units, 28 three bedroom units, 127 two bedroom units, and 56 one bedroom units. Under Ordinance No. 380, however, only 367 bedrooms are permitted; the applicant proposed to have 442 bed-

rooms and for this reason needed to request a special exception. The proposed apartment construction on Section 3 complied with the zoning requirements in regard to building coverage, green area and parking spaces. The expected rental range was from $112.00 to $267.00 per month.

At the hearing of July 16, 1969, Algis Pabarcius, representing the contract purchaser, National Health Foundation, and the prospective project manager, testified that the application "only covers section three." He produced the site plan for Section 3 which was offered and received in evidence. He also testified that the preliminary plan of the subdivision had been "approved by the Park and Planning Commission June 10, 1968" and that the site plan for Section 3 had been prepared "approximately in May 1968." His employers "had expended $118,542.20" on Section 3, consisting of costs for surveys, soil tests, architecture and engineering work, and another item for premium cost of Sections 1 and 2.

After giving the type of bedroom units making up the 223 apartment units in Section 3, he estimated that the number of bedroom units contemplated exceeded the ordinance requirements by 25%. He estimated that using his percentage of increase with other data supplied by the School Board, there would be an increase of 27 pupils resulting from the granting of the requested special exception.

In regard to the average projected increase of persons in the project, Mr. Pabarcius testified:

> "In the first section we did a survey and we found that it was approximately $5,600 per family and in the second and the third section, the project is going under the new FHA program, and there is no upper income limit for people living in the apartments, such as existed in the first. If the person is not making enough, the Government picks up part of his rent and he is supposed to only pay 25 percent of his income. At the same time, if 25 percent of his income

exceeds the rent of the apartment, he is supposed to pay more. In other words, they figure that a person should be able to afford to pay 25 percent of his income towards apartments. There is also an upper limit on the rents."

The Mayor of Glenarden testified in opposition to the granting of the application. He indicated that the Town Council was unanimously opposed to granting the special exception. The town was principally concerned with the crowding of the schools if the application were granted. A member of the Town Council also testified in opposition to granting the application, stating that he thought there were already too many apartments in the area.

The District Council thereafter recessed the hearing until July 25, 1969, to permit a representative of the Board of Education to testify in regard to the impact the granting of the application would have upon the school enrollment.

At the July 25 hearing, Blair Overton of the Board of Education presented that Board's findings in regard to the impact the granting of the application would have on the schools. He stated that there would be an increase of 36 elementary pupils when considering the special exception for Section 3 alone. Since the bedroom mix in Section 3 was decreased from the original estimate, the overall increase for the whole project—Sections 1, 2 and 3— would be nine students. A letter dated June 17, 1969, from the Board of Education to the Chairman of the Board of County Commissioners stated in regard to the subject application:

"It is anticipated that the increase in school enrollment from this special exception request and other zoning changes that have taken place in this area of Master Plan 72 North could overcrowd the existing and planned school facilities indicated for this area."

In a letter dated July 23, 1969, from the Board of Education to the Chairman of the Board of County Commis-

sioners, which included a Statistical Analysis Regarding Special Exception, Case Number 2020 (the subject application), it appeared that the existing zoning pupil yield would be 62 elementary pupils, 27 junior high pupils and 20 senior high pupils. If the special exception were granted, the pupil yield would be elementary pupils, 98 (an increase of 36), junior high pupils, 41 (an increase of 14) and senior high pupils, 31 (an increase of 11).

Both of the letters of June 17 and July 23, 1969, were made part of the record in the case.

On August 12, 1969, the District Council disapproved the application. After describing the application and the location of the 10.276 acre tract, the Resolution was in relevant part as follows:

### "FINDINGS OF FACT"

"1. The application is for a special exception from the bedroom unit percentage of the R-18 zone, from 367 bedrooms allowable to 442 bedrooms allowable. Only Section III was under consideration. Applicant sought an excess of units for three and four bedrooms by about 7.9 and two bedrooms by about 17.

"2. The hearing began on July 18, 1969, and was recessed and further hearings held on July 25, 1969, in order to hear further from the Board of Education.

"3. By the granting of the special exception, it would mean in Section III a projected increase of students of approximately 36 elementary students. By the granting of S.E. No. 1894, the increase in mix of bedroom units, and the granting of this application there would be a total increase of elementary pupils for the whole project of 312 pupils over that projected for the master plan. The projection of elementary pupil yield for the whole project in January, 1969, was 523 but has been revised to 532 elementary students."

## "CONCLUSIONS"

"1. The applicant has failed to show that the proposed use is in harmony with the purpose and intent of the Master Plan for the physical development of the district, particularly as to the planned elementary school enrollment.

"2. The applicant has not shown [that] the proposed development of Section III would not affect adversely the health and safety of the residents in the area or that it will not be detrimental to the development of the general neighborhood."

The applicant perfected an appeal to the Circuit Court for Prince George's County; and after the submission of legal memoranda and argument by counsel, Judge De-Blasis, in a well considered written opinion, indicated that the findings of the District Council would be sustained. An order of February 26, 1970 affirmed the action of the District Council and from that order the applicant took a timely appeal to this Court.

### 1.

The applicant Malmar earnestly contends that the District Council's action was not in accordance with the provisions of the zoning ordinance in regard to special exceptions.

§ 28.2, General Provisions of the Prince George's County Zoning Ordinance provides:

"A special exception may be granted when the council finds that:
"(a) The proposed use is in harmony with the purpose and intent of the General Plan for the physical development of the district, as embodied in this ordinance and in any Master Plan or portion thereof adopted or proposed as part of said General Plan.

"(b) The proposed use will not affect adversely the health and safety of residents or workers in the area and will not be detrimental to the use and/or development of adjacent properties or the general neighborhood."

Ordinance No. 380, approved October 1, 1968, amends various sections and subsections of the zoning ordinance in regard to various zones and stated that it was:

". . . to amend Section 28.0 relating to special exception uses; all for the purpose of prescribing in multiple-family zones percentage limitations on the number of bedroom units within a multiple-family apartment building or complex, or both, and providing for special exceptions in excess of stated percentages under specified conditions; and for related density-control purposes."

The ordinance then sets out four "WHEREAS" clauses as follows:

"WHEREAS, it has been found and determined that the health, safety, morals and general welfare of the present and future inhabitants of the Maryland-Washington Regional District in Prince George's County will be better served, and the overcrowding of land development and structures now and in the future for multiple-family occupation will be avoided if the density of occupation by family units or persons residing in such dwelling units and projects is further limited; and

"WHEREAS, for the purpose of lessening congestion in the streets; securing safety from fire, panic and other dangers; promoting health and the general welfare; providing for adequate light and air; avoiding undue concentration of

populations; and freeing from difficulty or impediment adequate provisions for transportation, water, sewerage, schools, parks and other public requirements, facilities and services; and

"WHEREAS, there had been duly advertised for public hearing on August 30, 1968, a proposed ordinance which endeavored to accomplish the aforegoing purpose of avoiding the overcrowding of land development and structures in multiple-family zones by the proposed adoption of a redefinition of a 'Dwelling Unit' as it applied in such zones by requiring such units to be counted according to a formula which would have added one-half ($\frac{1}{2}$) unit for each additional bedroom in excess of one (1) bedroom; and by other means related to density control; and

"WHEREAS, upon, and after such public hearing it has been determined that a more effectual method and formula may be utilized to accomplish the same stated purpose."

After amending certain sections and subsections in regard to Definitions, Uses Permitted, Special Exceptions, etc., Section 4 of Ordinance No. 380 amended Section 16A.0, titled " 'R-30 Zone (Multiple-Family, Low-Density Residential)' " as follows:

" '*16A.8 Bedroom Unit Percentages*
"*(a) The maximum percentages of two, three or more bedrooms per apartment unit in a separate apartment building or complex, or both, are as follows: For two bedroom apartments, forty percent; for three or more bedroom apartments, ten percent; provided, however, that unused percentages for three or more bedroom apartment units may be added to the maximum allowable percentages for two bedroom apartment units. Percentage limitations shall apply solely to ac-*

*tual dwelling units constructed within the building or complex, or both.*

*"(b) Within the meaning of this subsection, the term 'bedroom' shall be construed to mean any habitable room or enclosed floor space, other than one living room for each apartment unit used for the common social activities of the occupants; and shall be construed as being exclusive of a room(s) or enclosed floor space(s) arranged for eating, dining or cooking purposes; and shall be construed as being exclusive of accessory floor spaces such as foyers, hallways, pantries and bathrooms.*

*"(c) Consistent with the aforegoing, it is the intent and purpose of this subsection to include within the meaning of the term 'bedroom' any habitable room which is, or could be used for sleeping purposes, and irrespective of its being assigned a different name, such as, a 'study,' 'den,' 'recreation room' and the like.*

*"(d) Percentage limitations do not apply with respect to efficiency and one bedroom apartment units.' "*

By Section 8 of Ordinance No. 380, it was provided that Section 17.0, titled the R-18 zone (Multiple-Family, Medium-Density Residential)—in which the subject property is located—was amended to add a new subsection:

" '*17.9 Bedroom Unit Percentages*
Same as specified for the R-30 Zone (See Section 16A.8).' "

Section 15 of Ordinance No. 380 provides:

" 'Section 28.0, titled "Special Exceptions" is hereby amended in part by the addition of a new subsection, numbered and titled as follows: " '*28.352 Multiple-Family Dwellings; Bedroom Unit Percentages in the R-30, R-18, R-H and R-10 Zones maximum percentages of bedroom units per apartment unit in a separate building*

*or complex, or both, may be increased to the extent determined by the District Council upon a finding that such increase would be consistent with surrounding land-use, zoning, and the availability of adequate public facilities and services.'"*

Section 16 of Ordinance No. 380 then provides:
"All previously issued building permits for the erection of dwelling units which: (a) do not meet the requirements of this ordinance upon its effective date, and (b) where actual construction thereunder has not progressed to and including the point of pouring footings as of the effective date of this ordinance, are hereby revoked. Pending applications for building permits shall meet the requirements herein contained. New permits will be issued in both instances upon compliance with the requirements herein contained."

Section 17 makes Ordinance No. 380 an emergency measure going into immediate effect upon its adoption.

In *Board of County Commissioners for Prince George's County v. Luria,* 249 Md. 1, 238 A. 2d 108 (1968), the Court held that in a zoning case involving a special exception in Prince George's County, the applicant has the burden of proof in establishing *both* requirements of Section 28.2 already set forth, *i.e.,* that (a) the proposed use is in harmony with the general plan *and* (b) that the proposed use will not have an adverse effect on health and safety nor be detrimental to adjacent properties or to the general neighborhood.

We cited *Luria* with approval and followed it in *Board of County Commissioners for Prince George's County v. Lightman,* 251 Md. 86, 90, 246 A. 2d 261, 263 (1968) and in *Richmond Corp. v. Board of County Commissioners for Prince George's County,* 254 Md. 244, 263, 255 A. 2d 398, 408 (1969).

Although conceding that in the *usual* special exception case the applicant would carry the burden of establishing these requirements by testimony, the applicant contends in the present case that the type of special exception involved is an unusual and quite different type of special exception governed by Section 28.352, above quoted, which provides that the bedroom unit percentages in the zones in which the regulation is applicable may be increased to the extent determined by the District Council "upon a finding that such increase would be consistent with surrounding land-use, zoning and the availability of adequate public facilities and services."

In our opinion, there is no inconsistency between Section 28.2 and Section 28.352. Section 28.352 further defines and "localizes," as it were, the particular application of the general provisions of Section 28.2 so far as they relate to a special exception to increase the maximum percentage of bedroom units. Section 28.352 does not purport to repeal Section 28.2. It adds a gloss upon the general provisions of Section 28.2 and the two sections should be read and applied together. See *Domain v. Bosley*, 242 Md. 1, 217 A. 2d 555 (1966) ; *Mayor and Aldermen of City of Annapolis v. Kramer*, 235 Md. 231, 201 A. 2d 333 (1964) ; *May v. Warnick*, 227 Md. 77, 175 A. 2d 413 (1961).

If the proposed increase of maximum percentages of bedroom units per apartment unit in a separate building or complex was inconsistent with surrounding land use or zoning or if it was not consistent with the availability of adequate public facilities and services, then such a proposed use would affect adversely the "health and safety of the residents or workers in the area and/or development of adjacent properties or the general neighborhood." It was proper, in our opinion, for the District Council and for the lower court to consider the present case in the framework of both sections and the conclusions stated were not contrary to the provisions of those sections. The applicant is correct in stating that the principal reason for the conclusions of the District Council was its find-

ing of fact that proper school facilities would not be available if the special exception was granted. The burden was upon the applicant to show that school facilities would be available if the application was to be granted. The applicant failed to do this and the affirmative finding of the District Council to the contrary was based on substantial competent evidence as we have seen. We see no departure in the present case by the District Council from the requirements of the zoning ordinance.

The District Council contends that the applicant failed to define, with any degree of certainty, the location of *the neighborhood* in which the subject property is located and quotes from our decision in *Montgomery v. Board of County Commissioners for Prince George's County,* 256 Md. 597, 602, 261 A. 2d 447, 450 (1970) as making this a mandatory requirement, as follows:

> "Inasmuch as there is no contention in the present case that there was a mistake in the original zoning, it was necessary that the applicants establish before the District Council (a) what area reasonably constituted the 'neighborhood' of the subject property, (b) the changes which have occurred in that neighborhood since the comprehensive rezoning and (c) that these changes resulted in a change in the character of the neighborhood. These are the 'basic facts' and 'conclusions' which the District Council must find and express in writing when it grants or denies a map amendment or special exception."

Although we perhaps need not decide the contention of the District Council in this regard, in view of our decision that the applicant has failed to carry the burden of establishing the requirement already considered, we are of the opinion that this quotation from *Montgomery* should be clarified. Section 59-104 of the Prince George's County Code provides:

> "[N]o application for a *map amendment or special exception,* which is contested, shall be

granted or denied except upon written findings of basic facts and written conclusions." (Emphasis supplied.)

In the *Montgomery* case the District Council *granted* a *map amendment* and the quotation from *Montgomery* was directed to that situation and not to the *denial* of a map amendment or to an application for a special exception. The use of the words "a map amendment or special exception" at the end of the quotation was merely the use of the language in the statute; the "basic facts" and "conclusions" were those for the *granting* of a *map amendment* which was the issue before the Court, and not those necessarily applicable to the *denial* of a *map amendment* or the *grant or denial* of a *special exception*. In *Messenger v. Board of County Commissioners for Prince George's County,* 259 Md. 693, 271 A. 2d 166 (1970), we made it clear that the basic facts and conclusions required to be found for the *granting* of a map amendment were not those required for the *denial* of such an amendment. We now seek to make it clear that the quotation was not directed to basic facts and conclusions required for either granting or denying applications for special exceptions. By coincidence it happens that what constitutes the "neighborhood" is relevant to an application for a special exception by virtue of the provisions of Section 28.2 (b) and a consideration of consistency "with surrounding land-use and availability of adequate public facilities and services" required by Section 28.352. The requirement that the applicant offer evidence delineating the "general neighborhood" if a special exception is to be *granted* flows from the requirements of the two sections mentioned and not from the quotation in *Montgomery*. In the instant case, the application for the special exception was *denied* so that the basic facts and conclusions relevant to that determination have been appropriately set forth by the District Council in accordance with the requirements of Sections 28.2 and 28.352.

2.

The applicant, Malmar, contends that, in any event, the

finding by the District Council that the granting of the special exception would have an adverse effect upon the available school facilities was arbitrary and capricious, and hence a denial of due process of law, in that the testimony did not support the finding. Somewhat more precisely posed, the question is whether or not the applicant met the burden of proving by affirmative testimony that the requested increase in the maximum percentages of bedroom units per apartment unit would be "consistent" with "the availability of adequate public facilities and services." As we have already observed, the burden is upon the applicant to establish this requirement; it is not incumbent upon the District Council to find that adequate public facilities and services are not available, *Luria, supra*. In any event, in our opinion the testimony of Mr. Overton and the two letters from the Board of Education, already mentioned, support the District Council's finding that there would be an adverse effect upon the school facilities and hence adequate school facilities would not be available if the application were granted.

Malmar makes much of the fact that taking the overall figures for Sections 1, 2 and 3 there would only be an increase of nine elementary school students and this small number could have no important effect upon the school facilities. Even nine additional students in an overcrowded school situation may well be sufficient to support the District Council's conclusion inasmuch as the line must be drawn at some point; and if the cup is already completely full, even one additional drop will make it overflow. However, in the present case, it is proper, in our opinion, to consider the effect upon the school facilities resulting from the particular application for Section 3 involved in this appeal and before the District Council. As we have seen, when approached from this viewpoint, there would be from the granting of the application an increase of 36 elementary school pupils, as well as of 14 junior high pupils and 11 senior high pupils. As we see it, the findings and conclusions of the District Council in this regard were not arbitrary or capricious.

### 3.

We now come to the contention of the applicant, Malmar, that, in any event, Ordinance No. 380 is unconstitutional. This contention, like all Gaul, is divided into three parts and we will consider each part of the argument separately.

### a.

First of all, Malmar contends that the application of Ordinance No. 380 in the present case is retroactive and impairs Malmar's vested rights.

The applicant's theory is based on the premise that Malmar had obtained a vested right to proceed with the construction of Section 3 with the originally planned 442 bedrooms prior to the passage of Ordinance 380 on October 1, 1968. Without a special exception, the ordinance would limit Section 3 to 367 bedrooms. Malmar contends that it obtained this vested right because of the processing of Section 3 through the Federal Housing Administration (FHA) in the summer of 1967, the preparation of the site plan for Section 3 in May of 1968, the approval of the preliminary plan of subdivision by the Planning Commission on July 10, 1968, and the aforesaid expenditure of the $118,542.20 by Malmar in contemplation of the development of Section 3.

In our opinion, the decision of the Court in *Richmond Corp. v. Board of County Commissioners for Prince George's County*, 254 Md. 244, 255 A. 2d 398 (1969) is controlling on this issue and holds against Malmar's contention. In *Richmond,* the owner of the land had prepared its development plans to use land zoned R-R as a parking lot in connection with a proposed shopping center on land zoned C-1 at a time when a parking lot was a permitted use of the R-R land under the existing zoning ordinance in Prince George's County. As in the present case, large amounts had been spent in preparing plans and specifications for the erection of the shopping center with the adjacent R-R land to be used for the permitted parking purposes. Prior to the beginning of construction, however,

an ordinance was passed which required a special exception for such a parking use. The owner filed its application for the required special exception and, when that application was denied, appealed to the Circuit Court for Prince George's County (unsuccessfully) and thereafter to this Court, charging that its vested rights had been unconstitutionally impaired. In affirming the Circuit Court and sustaining the action of the District Council, after a review of the prior Maryland cases and a consideration of the majority and minority views among our sister states, we held that the prior decisions of this Court were consistent with the majority view in the rest of the country which was articulated by Professor Rathkopf in 2 *Rathkopf, The Law of Zoning and Planning* (3rd Ed.) 57-2 to 57-4, as follows:

> " 'It is generally held that neither the filing of an application for a building permit nor the issuance of a building permit, although valid and issued in conformity with the provisions of the zoning ordinance, alone confers any rights in the applicant or permittee as against a change in the zoning ordinance which imposes further limitations upon the use or structure proposed. As a matter of dicta, some courts have stated that the amendment of the ordinance constitutes, ipso facto, a revocation of any permit for a use or structure prohibited by the amendment.
>
> " 'Where the landowner has done nothing subsequent to obtaining the permit, he is usually held to be bound by any change in the zoning ordinance even if its effect is to nullify the permit.' "

(254 Md. at page 260, 255 A. 2d at page 406.)

In the present case, Malmar had obtained no permit for Section 3 and had begun no construction in that section. It is clear from the record that each section was treated separately and, indeed, Malmar filed an application for a special exception under Ordinance No. 380 for

Section 2, indicating that Malmar considered the respective sections to be separate and distinct. We conclude that Ordinance No. 380 as applied in the instant case does not operate as an unconstitutional impairment of any vested right.

### b.

The appellant Malmar next contends that Ordinance No. 380 is based upon an unreasonable restriction on private property unrelated to the general welfare.

It is well established that zoning to regulate density is a proper exercise of the police power. *Coronet Homes, Inc. v. McKenzie,* 84 Nev. 250, 439 P. 2d 219 (1968) ; *DiSalle v. Giggal,* 128 Col. 208, 261 P. 2d 499 (1953).

The public health, safety and welfare and density control are reasonably related; but, of course, the means used to control density must themselves be reasonable. Malmar contends that the limitation upon the number of bedrooms apartments may contain is not a reasonable means of achieving density control. We do not agree with this contention.

Malmar correctly states in its brief that "The growth of Prince George's County over the past decade—a doubling of population from 357,000 in 1960 to about 700,000 today—is an extraordinary phenomenon," citing "Population Estimates and Forecasts: Washington Metropolitan Area," issued by the Metropolitan Washington Council of Governments, (1969) at Table 2. This amazing population growth in such a relatively short period presents unusual and pressing problems to the County Government in regard to density control. Fortunately, there are legislative findings in the preamble to Ordinance No. 380 which we have already set forth. These findings indicate the pressing nature of the problem of density control and the formula devised to help to meet the problem of undue concentration of population. With a proper regard for individual property rights, the formula used in Ordinance No. 380 may be the subject of a special exception if the applicant establishes by testimony the applicable criteria.

We do not believe that it can properly be said that the means adopted by Ordinance No. 380 has no reasonable relationship to a reasonable density control and hence Ordinance No. 380 is not unconstitutional for this reason. See *Euclid v. Ambler Realty Co.*, 272 U. S. 365, 71 L. Ed. 303 (1926); *Norbeck Village Joint Venture v. Montgomery County Council*, 254 Md. 59, 254 A. 2d 700 (1969); *County Commissioners of Queen Anne's Co. v. Miles*, 246 Md. 355, 228 A. 2d 450 (1967); *Stevens v. City of Salisbury*, 240 Md. 556, 214 A. 2d 775 (1965).

### c.

Malmar, the applicant, finally argues that Ordinance No. 380 is unconstitutional because it is a denial of the equal protection of the laws forbidden to the States by Section 1 of the Fourteenth Amendment to the Federal Constitution.

The thrust of Malmar's argument on this point is that by limiting to 10% the number of three or four bedroom units in a given multi-family development, there is a limitation on the right of residents in Prince George's County who would like to acquire multi-bedroom units through condominium or cooperative ownership; and, further, it limits the rights of members of families of four or more persons who either cannot afford to purchase a single-family dwelling, or who do not wish to purchase one, to enjoy multi-bedroom apartments.

As we have already observed, the means used in Ordinance No. 380, in our opinion, have a reasonable relation to the purpose of the ordinance and we do not perceive how there is any unreasonable or unjustified basis for the classification adopted by the ordinance. In *County Commissioners of Queen Anne's County v. Miles*, 246 Md. 355, 228 A. 2d 450 (1967), we sustained the establishment of a zone for a minimum lot size of five acres. In sustaining the validity of this zoning requirement against the charge that it denied the equal protection of the laws, Judge Oppenheimer, for the Court, stated:

"A person who contends that there has been a denial of the equal protection of the laws has the burden of showing that his situation is the same as another situation, and that the State or its instrumentalities, has treated the two situations differently in an unreasonable or arbitrary manner. *Creative School v. Montgomery County Bd. of Apps., supra,* at 242 Md. 572."

\* \* \*

"We find that the appellees have not met their burden of showing that the classifications of which they complain were arbitrary, unreasonable or capricious."

(246 Md., pages 378, 379; 228 A. 2d, pages 462, 463.)

Although applicable perhaps to the other end of the economic spectrum, our comments in the *Miles* case are equally applicable to the contention of Malmar in the present case.

> *Order of February 26, 1970,*
> *affirmed, the appellant to*
> *pay the costs.*