## BOULEVARD SCRAP COMPANY *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 138, October Term, 1956.]

*Decided April 8, 1957.*

The cause was argued before BRUNE, C. J., COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Thomas J. Kenney,* with whom were *Avrum K. Rifman, Richard J. Moylan* and *Nathan Posner* on the brief, for appellant.

*Shirley B. Jones, Assistant City Solicitor of Baltimore,* with whom was *Thomas N. Biddison, City Solicitor,* on the brief, for appellee, Mayor and City Council of Baltimore, and

*Joseph S. Kaufman,* with whom was *William J. O'Donnell* on the brief, for Clarence Cavanaugh and the other appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from an order of the Baltimore City Court, affirming a resolution of the Board of Municipal and Zoning Appeals, disapproving an application of the appellant for a permit to use a certain lot of land for "storage and cutting of scrap metals and also the purchase, sale and preparation of scrap iron and metals and the re-sale of salvageable materials". The appellant contended below, and contends here, that the proposed operation does not fall within the definition of a "junk yard" in the Ordinance, and, if it does, that a nonconforming use was established that renders the provision of the Ordinance inapplicable.

The tract in question is an irregular, unimproved lot, designated as 1325 Western Avenue, with maximum dimensions of 265 by 387 feet, situated in an industrial use district, 100 feet northeast of Western Avenue and 652 feet southeast of Washington Boulevard. It forms part of a larger tract, containing about 80 acres, owned by the Baltimore and Ohio Railroad, known as the Wicomico Scrap Yard, which contains a timber scrap platform for loading, railroad trackage and various sidings. This yard has been used by the Railroad since 1918 for salvage operations. The land lies in a natural valley, and originally "this tract in back of the timber platform was all swamp and they kept filling in and using these tracks for dumping the trash and dirt and made this ground." It is not clear that the lot in question was filled in prior to 1931; the testimony was simply that the tracks were there in 1937.

On or about February 1, 1955, the Railroad leased the lot in question to the appellant. On April 5, 1955, the Board of Municipal and Zoning Appeals approved an application for the erection of a one-story steel and cinder block building on the lot to be used as offices and for the storage of salvaged materials, but noted that further authorization would be required for use as a junk yard. Construction was not commenced and the lot is still unimproved. On August 4,

1955, the appellant applied for a permit to use the lot for the purposes quoted above, and this was denied. While an appeal was pending, the appellant caused an ordinance to be introduced in the City Council seeking permission to use the lot as a junk yard, but this was subsequently withdrawn.

The Board took the position that the appellant had not established that the use made of the lot by the Railroad, consisting principally of the salvage of worn out or obsolete railroad cars and other materials used on all parts of the railroad system, by reducing them to scrap for resale, was of the same character as that proposed, which contemplated the purchase, scrapping and resale of salvageable materials without regard to source. Judge Byrnes expressed the same view. He said that "the salvaging operation of the railroad does not come within that definition of a junk yard, but was simply a salvaging operation common to all industry, and more particularly to those industries whose equipment must be constantly renewed." Drawing a distinction between scrapping one's own material, and purchasing the material of others for that purpose, he held that since the Railroad had not operated a junk yard, the appellant was not entitled to a permit for that purpose as a non-conforming use. There was testimony, however, that on at least one occasion the Railroad had purchased journal bearings from the Bethlehem Steel Company for salvage. He also noted a sharp conflict in the testimony as to the extent of use by the Railroad on the lot in question, as distinguished from other portions of the yard.

Section 4 of the Zoning Ordinance ▌ provides in part:

> "4 Industrial Use Districts. In an Industrial Use District, no use of land or building shall be excluded, except that
>
> (a) no land or building shall be used; * * * for * * *
>
> 14. Junk (scrap paper, metals, bottles, rags, rubber) yard or shop for purchase, sale, handling, baling or storage * * *

> unless by authority of an ordinance. Such authority may be granted by ordinance of the Mayor and City Council of Baltimore in industrial use districts only."

These provisions have remained unchanged since the passage of the original ordinance in 1931.

We think the Board and the trial court were correct in their decisions, but for a different reason. We find nothing in the Zoning Ordinance to support a distinction between scrapping one's own materials and those purchased from another. If such a distinction were valid, it would seem that an operator of a limekiln, for example, would be relieved of the necessity of obtaining authority by an ordinance, and thus exempted from the provisions of Section 4, if he owned a quarry as the source of supply, but not if he purchased limestone from another. Yet the fumes and other objectionable features of the operation would be as great in one case as in the other. The Zoning Ordinance is concerned with use, not with ownership, and designed to protect against uses deemed objectionable in the general public welfare. The appellees rely upon a statement in *State v. Shapiro*, 131 Md. 168, 174, but this was not a zoning case, and the Court was referring to a commercial junk dealer, rather than a junk yard. Moreover, Section 4(a)14 of the Ordinance refers to "purchase, sale, handling, baling or storage", in the alternative, and presumably a junk yard or shop, as there defined, would not necessarily be required to combine all of the activities mentioned in order for the section to be applicable.

We think, however, that the proposed use clearly involves an extension of the non-conforming use established prior to 1931. In the first place, it is proposed to erect a large building on the lot, where none has heretofore been erected. This in itself would ·be an extension. We have recently stated that the Baltimore City Ordinance does not permit an extension in area either horizontally or vertically. See *Shannahan v. Ringgold*, 212 Md. 481, in which we expressly overruled *Bruning Bros. v. City of Baltimore*, 199 Md. 602. In the

*Shannahan* case, we held that under the Talbot County Zoning Ordinance a non-conforming use of a new building cannot be claimed merely because a similar use had been established on open land where the building was erected. See also *Knox v. City of Baltimore,* 180 Md. 88, 95, where it was held that a new building would be an extension of a non-conforming use, if established. Cf. *Colali v. Jirout,* 186 Md. 652, and *Fritze v. City of Baltimore,* 202 Md. 265. See also *Green v. Board of Com'rs of City of Newark,* 36 A. 2d 610 (N. J. L.).

The original ordinance of 1931 prohibited the extension of a non-conforming use. If there were any doubt as to the application of that language to the erection of a new or larger building, it is set at rest by the amendments of 1953. We had occasion to comment on another amendment of that year in *Grant v. Baltimore,* 212 Md. 301. In the present Ordinance, Section 13(c) provides: "A non-conforming use may not be extended, increased in size and buildings may not be erected or extended on land used as a non-conforming use unless approved by the Board of Municipal and Zoning Appeals as provided in Section 14 [Special Exceptions]." Since we assume that the erection of a building is an essential part of the proposed use as a junk yard or shop by the appellant, it would seem that for all practical purposes this is decisive of the case.

However, we think the claim as to a non-conforming use of the lot is not sustained by the evidence. At its nearest point, the lot is about 60 feet from the siding or spur track on which old railroad cars were placed. These were thrown over alongside the track by means of a crane and burned or cut up to obtain scrap metal where they came to rest. Other cars, loaded with old metal, were brought in and stored on the same siding until such time as the contents were cut up or baled. The burning operation was stopped when a smoke ordinance was passed in 1937. While there was testimony that the operation sometimes extended over 60 feet from the

track, it seems highly unlikely that the cars ever came to rest on the lot in question. There was testimony that a portion of the lot was used for storage, but the only specific testimony as to storage was that at one time it was so used when the overhead steel structure at Camden Street Station was removed. That, of course, was only on one occasion, and the date when this was done was not fixed. None of the Railroad employees who testified was explicit as to the extent of use. Mr. Ritter testified: "A portion of it [was used]. I wouldn't say the whole area." At one point he estimated that one-third of the lot was used. In response to a question by the Chairman: "Does that leave you space if this part is leased?", he replied: "That is for the management to decide, not me."

Mr. Litchfield testified that practically the whole yard was used, but "how much of this property, this particular plat, was used I couldn't say but there was a portion of it." Almost all the metal came in on railroad cars, although some came in locally by truck. Some of the finished product was sold locally and trucked away, but most of it was sent by cars to Pittsburgh. The appellees produced testimony that the whole lot was covered with well grown trees and bushes, until quite recently, when most of it was cleared by bulldozers. One witness testified that only about 10% of the lot was ever used for any purpose by the Railroad. Another testified that in the last nine years it was not used at all.

We think at best the evidence only establishes a casual or occasional use of a portion of the lot for storage. Cf. *Mayor & C. C. of Balto. v. Shapiro,* 187 Md. 623, 635, and *Daniels v. Board of Zoning Appeals,* 205 Md. 36, 41. The proposed use of at least two-thirds of the lot would clearly be an unlawful extension of the non-conforming use established for the siding and those portions of the yard retained by the Railroad. Even accepting the testimony that one-third of the lot had been used occasionally for storage, the testimony is too vague and inconclusive to establish that such use was regularly made prior to the passage of the Ordinance in 1931.

*Order affirmed, with costs.*