## MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *v.* POE ET AL.

[No. 149, September Term, 1960.]

(Two Appeals In One Record)

*Decided March 10, 1961.*

*Motion for rehearing filed April 10, 1961, denied April 12, 1961.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*John A. DeWicki, Assistant City Solicitor* and *Charles B. Heyman,* with whom were *Harrison L. Winter, City Solicitor,* and *Sol C. Berenholtz* on the brief, for appellants.

*J. B. Randol Carroll* and *Rignal W. Baldwin,* with whom were *Richard W. Emory* and *C. Keating Bowie* on the brief, for appellees.

SYBERT, J., delivered the opinion of the Court.

A successful application was made by the appellant, Phi Sigma Delta Alumni Association, Johns Hopkins University Chapter, Inc., to the Bureau of Building Inspection of Baltimore City to use the property at 3904 Canterbury Road, Baltimore City, for a fraternity house. The Board of Municipal and Zoning Appeals affirmed the granting of the permit on appeal by the appellees (neighbors, nearby property owners, and a neighborhood improvement association). Upon appeal to the Baltimore City Court by the appellees the decision of the Board was reversed, whereupon Baltimore City and the fraternity brought this appeal.

The fraternity purchased the property in August, 1959, for use as the fraternity house of its local chapter, The Johns Hopkins University Chapter of Phi Sigma Delta Fraternity. Prior thereto, the local chapter had occupied property at 3801 Canterbury Road, where it had carried on its activities, including provision of sleeping facilities for some of its members. The record shows that the local chapter has about fifty-nine members, approximately one third being Baltimoreans and the remainder being students from out of town.

In the fraternity house there are meeting rooms, study rooms, a television room, a card room and a ping pong room. In addition, there are a dining room, a kitchen and eleven sleeping rooms, presently occupied, according to the testimony, by eleven or thirteen students. Present plans contemplate housing a total of eighteen or nineteen when the necessary alterations are completed. Two persons are employed by the fraternity for cooking and cleaning purposes. The various facilities are available to all members of the fraternity and activities are financed by dues paid into a common fund, the amount of the dues being determined by whether a member is a resident or a non-resident of the house.

The record details the activities carried on in the fraternity house. Each year the members of the local chapter elect offi-

cers and designate various committees, including a social committee, a house committee, a rushing committee, a scholarship committee, an athletic committee and a charitable activities committee. The regular bi-weekly meetings of the fraternity, social activities of the chapter, whether it be a smoker, a rush affair for freshman students, a formal initiation ceremony, a dance or other function, committee meetings and committee activities, all take place at the fraternity house, except occasionally when an affair may be held at a hotel or other location. The chapter has a system of tutoring by proficient members, who make a charge for such service.

The property is a three story and basement brick building, located in a Class E Residential Use District, and prior to its acquisition by the fraternity it was used as a four apartment dwelling. The planned use of the house for the activities of the fraternity has given rise to the present litigation.

Appellants contend that the fraternity is a non-profit, social and scholastic organization. They cite its objectives, as set forth in its charter: "* * * the non-commercial, social, educational and fraternal purposes of the Phi Sigma Delta Fraternity * * * and for the non-profit purpose of upholding the general welfare, social, scholastic and educational interests of The Johns Hopkins University Chapter of Phi Sigma Delta Fraternity". They argue that the finding of the Board that occupancy of this house by the fraternity would not constitute a business or club such as is excluded from a residential use district under the Baltimore City Zoning Ordinance, was the correct interpretation of the law.

In the opinion of the lower court, however, since the major portion of the house was devoted to living quarters, the providing of room and board was the chief activity, and such use was, therefore, prohibited under the Ordinance as a business activity. The lower court felt the word "club" in the Ordinance referred not to the organization, but rather to the use of the property itself.

Article 40, § 10, Baltimore City Zoning Ordinance (1958 Rev.), sets forth uses excluded from Residential Use Districts. Among them are uses excluded from Residential and Office Use Districts. These are delineated in § 9, which reads in part as follows:

"9. Residential and Office Use Districts. In a Residential and Office Use District, no use of land or building shall be excluded, except that

(a) no land or building shall be used; * * * for—

32. Club, the chief activity of which is a service customarily carried on as a business, provided, however, that nothing in this ordinance shall be construed to exclude the sale of beverages or food products such as are customarily served to members only, but such permissive use shall not be construed to authorize the construction of any building or alteration of any building, which indicates that the building was used or is intended to be used for commercial purposes, and it is hereby declared that such club use shall not be construed to be classified as a commercial use, nor may such club use be changed to a commercial use which is excluded from a Residential and Office Use District or Residential Use District by any other provisions of this Section * * *."

The Zoning Ordinance of 1931 originally couched Exception 32 only in the following language: "Club, the chief activity of which is a service customarily carried on as a business". Apparently question was raised as to the scope of this language with respect to the activities of private clubs and it appears significant that the more extensive language hereinbefore quoted was added by ordinance in 1933. Obviously it was inserted in order to protect the traditional activities of private clubs, so long as they were confined to the use of members only and not made available to the public generally. Some private clubs have always provided sleeping quarters for some of their members and, since such practice has been traditional, it apparently was not regarded as a service necessary to be mentioned in the amendment.

The other forty-five exceptions in § 9 have not required clarification over the years. The obvious activity of a baker or a tailor needs no further investigation to merit its exclusion from a residential neighborhood. Thus the word "bakery" or "tailoring establishment" in the ordinance is enough to make

the exclusion of all bakers and tailors clear. However, the word "club" covers an extensive field and the Legislators did not intend to exclude all clubs, but only clubs whose chief activity was of a business nature.

Appellants contend that this fraternity is not a "club, the chief activity of which is a service customarily carried on as a business * * *" and that, since it is not excluded by the Ordinance, it has a permissible use. They argue that the word "club" refers to the organization or association of persons and not to the use of the property. They further claim that even if the trial court's interpretation is correct, the manner of use of the property by the fraternity does not constitute a business activity.

Appellees, relying on the interpretation of the lower court and *Keseling v. Mayor & C. C. of Baltimore City*, 220 Md. 263, 151 A. 2d 726 (1959), argue that the chief activity at the fraternity house was the providing of living quarters to members and that such use would result in a profit and thereby constitute a business in the nature of a rooming house. They would have the Court look solely to the use of the property and not to the objects and purposes of the organization.

It is settled law in this State that the zoning ordinance is concerned with the use of property and not with ownership thereof nor with the purposes of the owners or occupants. Judge Henderson, speaking for this Court in *Boulevard Scrap Co. v. Mayor & C. C. of Baltimore*, 213 Md. 6, 10, 130 A. 2d 743, 745 (1957), said:

> "The Zoning Ordinance is concerned with use, not with ownership, and designed to protect against uses deemed objectionable in the general public welfare."

Accordingly, the question with respect to Exception 32 as to clubs is whether the dominant use of the property, or, in the words of the ordinance, the "chief activity" carried on thereon, is such as is "customarily carried on as a business".

In support of their contention that the principal use of the premises is as a boarding house, appellees point out that eleven members of the fraternity are already housed on the premises,

and that plans are being made to provide facilities for eighteen or nineteen members eventually at one hundred dollars per month each for dues, room and board. (Members who do not "live in" pay dues of fifteen dollars per month only.) Appellees argue that this clearly establishes the dominant use to be a rooming house operation which is a service customarily carried on as a business. They discount the other activities of the fraternity on the premises.

Appellees place strong reliance on *Keseling v. Mayor & City Council, supra,* to establish the restriction against the number of men rooming in the fraternity house. In the *Keseling* case, owners of the premises in question had converted their home into four apartments and an office prior to the enactment of the original zoning ordinance in 1931, thus establishing a non-conforming use in a residential neighborhood. In 1957 they split the apartments into seven apartments but were later denied a permit to do so. They then attempted to convert three of the apartments so as to make provision for seven roomers in addition to the original four apartments and office. Their application for such use was disapproved by the Zoning Enforcement Officer as a commercial use and the ruling was upheld by the Board and trial court on the basis of violation of density restrictions of the Multiple Dwelling and Housing Ordinance of 1958. This Court affirmed the holding of the court below, but rather on the basis that the principal use of the building was clearly that of renting dwelling quarters to others, a commercial use prohibited by the zoning ordinance.

We feel that the factual situation in that case is distinguishable from that of a house owned by a fraternity organization, which as an incidental part of its program provides room and board for a rather small proportion of its members. In the *Keseling* case it was apparent to the Court that the "* * * principal use of the building clearly would seem to be the renting of dwelling quarters to others". *Keseling v. M. & C. C. of Balto. City, supra,* at p. 270. On the record presented to us here, this is not the case with the fraternity house in question. The chief activities carried on at this fraternity house, hereinbefore mentioned, have clearly been established to be

social and educational functions for the benefit of the whole membership. The fact that rooming facilities are provided for some members as an accessory or incidental use does not make the dominant use of the house a business proposition. This fraternity is exempt from federal taxation as a non-profit organization, and we may assume that any excess income over and above that which is needed for the upkeep of the house will be used to further the non-profit, non-business objectives of the fraternity.

In *State v. Allen*, 127 N. E. 145, 189 Ind. 369 (1920), the court, in discussing the nature of activities in a fraternity house, remarked:

> "Because some [of the] members of this fraternity board and sleep in this building, and pay what it costs to run the building, does not make the dominant use boarding and lodging. Every human being must eat and sleep to live; but this does not make the dominant purposes of life eating and sleeping."

While the *Allen* case involved a question of tax exemption, we adopt its conclusion as to dominant use with respect to the facts of the instant case.

We conclude therefore that the principal use which this fraternity is making of the premises in question does not constitute a "service customarily carried on as a business" under the zoning ordinance.

The Court recognizes the problem that neighborhoods in proximity to a college campus face when, as sometimes happens, youth tends to overflow with exuberance to the point of creating disturbance and disorder. While "young blood must run its course", it must also be restrained, when necessary, by resort to local police enforcement or injunctive relief. This then is the legal remedy available and not the present zoning ordinance. *Nyburg v. Solmson*, 205 Md. 150, 160, 106 A. 2d 483, 488 (1954).

The finding of this Court, therefore, is that the Board's interpretation of Art. 40, § 9 (a), 32, is the correct one and the order of the lower court must therefore be reversed. In view of

436

this holding, it is unnecessary to pass upon the procedural question raised by appellants.

> *Order reversed, with costs to appellants, and case remanded for entry of an order affirming the Board.*