## FELDSTEIN, t/a ABE FELDSTEIN JUNKYARD *v.* LAVALE ZONING BOARD

[No. 198, September Term, 1966.]

*Decided April 6, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, 'OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*William H. Geppert* and *Hugh A. McMullen,* with whom were *Gunter & Geppert* on the brief, for appellant.

*Lee C. Barnett,* with whom were *Paul W. Barnett* and *Barnett & Barnett* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

Whether or not the expansion of the high-rise junkyard owned by Abe Feldstein was an extension or an intensification of a nonconforming use is the primary question presented by this appeal from an order of the Circuit Court for Allegany County in Equity granting in part and denying in part the injunctive relief sought by the LaVale Zoning Board. The junkyard, which has been in operation since 1939, was the subject of another injunction suit before the zoning ordinance was adopted on April 30, 1958. In *Feldstein v. Kammauf,* 209 Md. 479, 121 A. 2d 716 (1956), the requirements of the lower court that the junkyard be fenced from view or that the junk should be removed unless the yard was enclosed were reversed by this Court.

In the present case, the zoning board was the plaintiff below and the owner was the defendant. On appeal, the owner is the appellant and cross-appellee and the board is the appellee and cross-appellant.

LaVale is an unincorporated suburb of Cumberland having extensive residential areas as well as smaller industrial and commercial areas. The parcel of land on which the junkyard is operated is a part of a larger tract of bottom land running with the southerly side of Braddock Run and the northerly side of, but ten feet below, the National Highway, which, besides the junkyard, is occupied by a railroad siding and a number of industrial plants and commercial businesses. The junkyard is located at the western end of this elongated area (three-fourths of a mile long from east to west with a maximum width of three hundred yards from north to south) and in the main is surrounded by residential areas. The junkyard is situated in a Commercial B Zone—permitting use by heavy industry—as a nonconforming use under § 10(a)1-10 of Part I-A of the zoning ordinance which also provides in § 4 of Part III-C that all presently existing junkyards must be screened within a year by the erection of a fence or wall or by the planting of trees, shrub-

bery or other planting. An eight-foot high fence was to be considered as adequate screening.

The zoning board, alleging that the owner had expanded his nonconforming use contrary to the provisions of § 10(a)3 of Part I-A and had not complied with the provisions of § 4 of Part III-C, sought an order permanently enjoining the defendant from extending his junkyard beyond the area occupied at the time the ordinance was adopted and requiring the defendant to cease operation of his business until screening had been provided.

At the trial below, evidence was produced on behalf of the zoning board tending to show that the piles of junk had increased in height from a maximum of eight feet to an average of twenty to twenty-five feet. There was other oral evidence to the effect that the western portion of the junkyard, including a narrow strip of land (approximately three hundred feet long by seventy feet wide), had not been used for the storage of junk prior to the adoption of the ordinance but was presently being used for that purpose. And there was photographic evidence showing that junk had been piled in the easterly portion of the junkyard to the edge of the traveled part of Lane Street.

The owner, on the other hand, produced evidence showing that the entire yard had previously been used for the storage of junk, that the height varied from time to time but had not increased in the last ten years and that an eight-foot fence, besides costing more than $20,000, would not conceal the junkyard from sight. In rebuttal to the testimony of the witnesses for the zoning board, the owner not only testified that approximately one thousand tons of scrap metal was stored on the narrow westerly part of the yard before the adoption of the ordinance, but several disinterested witnesses also testified that a substantial quantity of junk was piled in that part of the yard before the critical date and specifically described some of the items. Even some of the witnesses for the zoning board admitted that some junk was stored thereon before April of 1958.

After the chancellors had decided the case, the owner requested and was afforded an opportunity to present additional evidence. At the rehearing, the owner not only presented additional oral testimony to the effect that large quantities of steel

rails, beams, shafts and pipes as well as a number of discarded motor vehicles were stored throughout the whole of the area in dispute before the critical date, but also introduced documentary and photographic evidence showing that twenty-nine large railroad tanks bought in 1956 were still stored in the yard in 1958 and that part of them had been placed in the westerly portion thereof. The lower court, however, affirmed its original rulings at the conclusion of the rehearing.

The chancellors made four principal findings of fact. They held that the enclosure of the junkyard, even if enforceable, would not, due to the terrain, serve the purpose intended by the ordinance. They also held that the junk piled in the easterly portion of the yard along Lane Street was a hazard to pedestrian as well as vehicular traffic and, in the interest of public safety and the general welfare, ordered that it either be removed into the interior of the yard or that a fence be constructed along the street to prevent the junk from spilling into it. No appeal was taken on either of these findings.

The chancellors, in holding that the area measuring three hundred feet by seventy feet had had only casual use as storage for scrap metal prior to the adoption of the ordinance and that its present utilization for that purpose constituted an extension of the nonconforming use in violation of the ordinance, ordered the removal of all material from the area. The owner-defendant appealed this point. The chancellors also held that the increase in quantity and height of scrap metal stored on the remaining area of the junkyard (except for a parcel of land along the northerly boundary purchased in 1964 on which the storage of junk would be unlawful) was an intensification and not an extension of the nonconforming use under the law. And the zoning board-plaintiff filed a cross-appeal on this point.

It is apparent that these appeals relate to different aspects of the same question. One, as to whether the use of the westernmost part of the junkyard for storage purposes was casual or deliberate, is primarily a question of fact. The other, as to whether the increase in the height and quantity of scrap metal was an extension or an intensification of a vested nonconforming use, is primarily a question of law.

(i)

The order from which the direct appeal was taken must be reversed. While we have consistently held, both prior to and since the effective date of Maryland Rule 886 a, that findings of fact will not be set aside unless clearly erroneous, we think the chancellors were in error in holding that the use of the narrow western area of the junkyard for the storage of junk prior to the critical date was casual and that the present use thereof for that purpose amounted to an extension of the nonconforming use. Although the evidence at the original hearing was conflicting, that produced at the rehearing was not, for none of it was contradicted. Not only does the testimony of the disinterested witnesses show an extensive use of the area, but the documentary and photographic evidence introduced at the rehearing was unmistakable proof that several bulky steel tanks and a sizeable quantity of discarded mine rails were stored thereon during the summer of 1957. Clearly, the use made of the area was more than a casual or temporary one. *Cf. Boulevard Scrap Co. v. M. & C. C. of Baltimore,* 213 Md. 6, 130 A. 2d 743 (1957); *Daniels v. Board of Zoning Appeals,* 205 Md. 36, 106 A. 2d 57 (1954); *M. & C. C. of Baltimore v. Shapiro,* 187 Md. 623, 51 A. 2d 273 (1947); *Chayt v. Board of Zoning Appeals,* 177 Md. 426, 9 A. 2d 747 (1939). Since one of the tests for determining the existence of a nonconforming use is whether such use was known in the neighborhood, *Chayt* and *Shapiro,* both *supra,* it is not likely that those who resided in the vicinity of the western part of the junkyard during 1956, 1957 and 1958 did not know that the area was in use as a storage for unusually bulky pieces of junk. Other than this, because the temporary disuse of a nonconforming use does not amount to a surrender of the use, an owner of property will not be deemed to have lost his right to the nonconforming use until the relinquishment thereof has been clearly indicated by evidence of intention, action or inaction for a reasonable period of time. *Beyer v. M. & C. C. of Baltimore,* 182 Md. 444, 34 A. 2d 765 (1943).

(ii)

On the cross-appeal, the chancellors will be affirmed. Whether or not a nonconforming use can be enlarged or extended is

ordinarily governed by the provisions of the local ordinances and regulations. *Phillips v. Zoning Commissioner of Howard County,* 225 Md. 102, 169 A. 2d 410 (1961). The zoning ordinance (§ 10a3) in this case provides that a nonconforming use shall not be extended, but that does not mean that the vested nonconforming use of the junkyard owner could not be lawfully intensified. The chancellors held that the increase in the quantity and height of the stored scrap metal was an intensification and not an extension under the law. We agree. The rule that a change from one nonconforming use to a new and different one constitutes an extension of the use is found in that line of cases extending from *Chayt v. Board of Zoning Appeals,* 177 Md. 426, 9 A. 2d 747 (1939) to *Phillips v. Zoning Commissioner of Howard County, supra.*[1] While a nonconforming use should not be extended or perpetuated longer than necessary, the more frequent present use of property for the same or a similar use than that for which it had been used less frequently theretofore was held to be an intensification and not an extension in *Green v. Garrett,* 192 Md. 52, 63 A. 2d 326 (1949) and *Nyburg v. Solmson,* 205 Md. 150, 106 A. 2d 483 (1954). *Cf. Jahnigen v. Staley,* 245 Md. 130, 225 A. 2d 277 (1967).

The cases cited by the cross appellant to support the claim that the increase in height amounted to an extension are readily distinguishable. Four of the cases—*Colati v. Jirout,* 186 Md. 652, 47 A. 2d 613 (1946) ; *Fritze v. M. & C. C. of Baltimore,* 202 Md. 265, 96 A. 2d 4 (1953) ; *Shannahan v. Ringgold,* 212 Md. 481, 129 A. 2d 797 (1957) and *Boulevard Scrap Co. v. M. & C. C. of Baltimore, supra*—involved extensions by the erection of new and different buildings expressly prohibited by the zoning regulations, not an increase in a lawful preexisting usage of the property as was the situation in the present case. the other case relied on—*Phillips v. Zoning Commissioner of Howard County, supra*—concerned a change in the nonconforming usage of the property as a used car lot and warehouse for

---

1. Other cases in the *Chayt* line include Knox v. City of Baltimore, 180 Md. 88; Colati v. Jirout, 186 Md. 652; Cleland v. City of Baltimore, 198 Md. 440; Fritze v. M. & C. C. of Baltimore, 202 Md. 265; Shannahan v. Ringgold, 212 Md. 481; and Boulevard Scrap Co. v. M. & C. C. of Baltimore, 213 Md. 6.

the storage and sale of secondhand furniture to a use of the lot as a junkyard for the dismantling and wrecking of motor vehicles—a lower classification that was prohibited without the approval of the zoning commissioner. There is no similarity between that case and this.

With these holdings we need not decide in this case the question as to whether or not there is a conflict between that part (Part III-C) of the zoning ordinance relating to junkyards and that part (§ 10 of Part I-A) concerning nonconforming uses.

> *Order reversed in part and affirmed in part and case remanded for the entry of an order in conformity with this opinion; the appellee and cross-appellant to pay the costs.*