HARRIS USED CAR CO., INC., ET AL. *v.* ANNE ARUNDEL COUNTY, MARYLAND

[No. 286, September Term, 1969.]

*Decided April 1, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*William J. Boehm* and *Stanford G. Gann,* with whom were *Levin, Gann & Hankin* on the brief, for appellants.

*Paul F. Borden, Assistant County Solicitor,* with whom was *Phillip F. Scheibe, County Solicitor,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 419 *infra.*

In the summer of 1964, Harris Used Car Co., Inc. (Harris) purchased from Edward G. Lavender a tract of approximately 3 acres on Evergreen Road about 100 feet west of Route 3 in Gambrills, Maryland, in the Fourth Election District of Anne Arundel County (the County). On 24 April 1964, Lavender, acting in Harris' behalf, had obtained from a County zoning official an Occupancy Certificate authorizing the tract, which was zoned agricultural, to be used as a "Used Car lot and Salvage auto garage." Attached to the application for the certificate was the sworn statement of Lavender and three residents of the area that "* * * the Garage on Evergreen Road in Gambrills, Maryland, owned by Edward G. Lavender, has been used as a garage continuously since 1942."

Relying on the permit, Harris moved some vehicles from Baltimore and commenced the operation of an automobile junk yard on the property. On 17 December 1965, the County notified Harris that it was voiding the Occupancy Certificate because it had been issued in error. No appeal was taken to the County's Board of Appeals, but after the time for appeal had expired, Harris requested the County's Office of Planning and Zoning "* * * to review this matter with the hope of reissuing the Certificate."

Six months later, in July of 1966, the County filed a bill in equity against Harris, its president and the manager of the junk yard seeking an injunction forbidding the use of the property for a "used car, salvage auto garage, and junk business * * *." The case finally came on for trial in October of 1968, and from a decree entered on 6 March 1969, enjoining Harris from using the property for any purposes not permitted in an agricultural zone and requiring the removal of "all wrecked and salvage vehicles and parts and used cars," Harris has appealed.

Harris raises two questions: (i) Does it have a valid non-conforming use? (ii) Assuming that a non-conform-

ing use has not been established, is the County estopped from revoking the Occupancy Certificate by delay?

### (i)

The trial below extended over two days, during which the court heard fourteen witnesses. The testimony was sometimes conflicting, often indecisive and discursive. At the conclusion of the hearings the chancellor (Melvin, J.) filed an opinion in which he found the following facts:

"1. The defendant corporation purchased the property (3.1 acres) in August, 1964.

"2. The former owner, Edward T. Lavender, conducted an extensive auto junk and salvage business on the property from about 1940 until 1945. Thereafter, pursuant to a federal order, Lavender disposed of practically all the used and junked cars and discontinued the business in 1946 or 1947. Although there may have been two or three abandoned vehicles on the property at that time, the property was no longer used by Lavender as an auto junk yard or used car lot.

"3. Between 1945 and 1947 a quonset hut and cinder block building were erected on the property in which Lavender stored some old auto parts.

"4. For a two year period between 1946 and 1948 Lavender rented the cinder block building to Laurence W. Chaney who used the building to maintain his vehicular equipment used in connection with his lumber business. Chaney, a defense witness, testified that during this two year period, Lavender conducted 'no business' on the property.

"5. For another one or two year period prior to 1961, the cinder block building was leased to a sewer cont[r]acting company which used it to store and maintain its vehicular equipment.

"6. In 1961 the cinder block building 'and the ground under it' were rented to Mitchell Harris

[who was in no way connected with the appellant Harris] who said he used the building until March of 1964 only to repair his own vehicles. In March and April 1964 he used it to 'work on other people's cars' also. He also said that during the three year period, 1961-1964, Lavender conducted no business on the property.

"7. On April 24, 1964, a county zoning official issued a zoning certificate of occupancy to the corporate defendant [Harris] purporting to authorize use of the property as a 'used car lot and salvage auto garage.'

"8. On December 17, 1965, this certificate of occupancy was revoked by the Office of Planning and Zoning and no appeal was taken from this administrative action by the defendants."

We are mindful that Rule 886 a provides that when a case has been tried below without a jury the judgment of the lower court will not be set aside on the evidence unless it is clearly erroneous.

There is substantial evidence in the record to support the chancellor's conclusion that Lavender had abandoned his use of the property as an automobile junk yard or used car lot by 1947, which was several years prior to the effective date of the first comprehensive zoning ordinance for the Fourth Election District, within which the property lies, on 25 July 1950. We have reviewed this finding, as we must, in the light most favorable to the party prevailing below, *Space Aero Products Co. v. R. E. Darling Co.*, 238 Md. 93, 105, 208 A. 2d 74, 699 (1965) and on the record before us cannot hold that the finding was erroneous much less clearly erroneous.

Sec. 35-10 of the Zoning Ordinance of Anne Arundel County, effective 1 July 1952, provides:

"A lawful nonconforming use existing on the effective date of the adoption of this chapter may continue; provided, however, upon any change from such nonconforming use to another

nonconforming use in a more restricted classification, or to a conforming use, or in the case of the abandonment of such nonconforming use for the period of one year, the right to continue such original nonconforming use shall cease. A nonconforming use may change to a use permitted in the most restricted district in which such existing nonconforming use is permitted under this chapter or to a more restricted classification." Zoning Ordinance of Anne Arundel County (1958).

In its brief, Harris asserts that the date on which zoning of the area first became effective was 2 December 1947, citing *Laque v. State,* 207 Md. 242, 249, 113 A. 2d 893 (1955). We are not persuaded by this argument, because the property in *Laque* was located in the Fifth Election District, where the ordinance before the Court had first been made applicable to that District by a resolution of the Board of County Commissioners adopted on 2 December 1947.

As we see this case, the issue is not necessarily whether the non-conforming use was abandoned, compare *Landay v. Bd. of Zoning Appeals,* 173 Md. 460, 196 A. 293, 114 A.L.R. 984 (1938) with *Dorman v. Mayor & C.C. of Baltimore,* 187 Md. 678, 51 A. 2d 658 (1947) but rather whether the property was being used for any non-agricultural purpose on the date the first zoning ordinance became effective, whether it be 25 July 1950, as the court assumed, relying on *Laque v. State, supra,* or 1 July 1952, when the first comprehensive ordinance became effective for the entire County, as the County contended, *Stieff v. Collins,* 237 Md. 601, 207 A. 2d 489 (1965). There was evidence to support a finding that no such use existed on either of these dates. A mere intention to use is not enough to establish a non-conforming use. *Chayt v. Bd. of Zoning Appeals,* 177 Md. 426, 9 A. 2d 747 (1939) ; *Beyer v. Mayor & C.C. of Baltimore,* 182 Md. 444, 34 A. 2d 765 (1943).

(ii)

Harris would have us hold that the County was estopped from revoking the Occupancy Certificate because while a permit illegally, erroneously or mistakenly issued vests no rights in the holder, *Mayor & C.C. of Baltimore v. Shapiro,* 187 Md. 623, 634, 51 A. 2d 273 (1947), in the absence of fraud, substantial expenditures made in reliance on the permit may confer certain rights. *Town of Berwyn Heights v. Rogers,* 228 Md. 271, 179 A. 2d 712 (1962) ; 2 Metzenbaum, *Law of Zoning* Ch. X-f-1 (2d Ed. 1955) at 1167; 2 Rathkopf, *The Law of Zoning and Planning,* Ch. 57-6 § 3 (3d Ed. 1966) ; 8 McQuillin, *Municipal Corporations* § 25.95 (3d Ed. 1965) at 272.

Assuming the correctness of Harris' contention, the record provides no hook on which Harris can hang its hopes. Only two oblique hints appear, one in the testimony of Burgone, the manager of Harris' yard, when he described a meeting with a County zoning official:

> "I said that we had spent several thousands of dollars on—after we got the permit. We had the permit. We was in business in Baltimore City. We disposed of our business and come down here and invested thousands of dollars [1] and I would like to know what was happening."

The second appeared, curiously enough, when Lavender was being cross examined by the County's attorney:

> "Q41 And I imagine that this was a condition of your contract with Harris that he would be able to operate the property as a Used car and salvage business when he bought it?
>
> "A No, I told them that I used to run a junk yard there and he asked me, 'did you do any burning,' and I said, 'Yes, I did

---

1. At argument, Harris' counsel said that expense had been incurred in moving an unspecified number of cars from Baltimore to Gambrills.

burning.' And that was all. Now whether he [in]ferred that I sold it to him as a going business or not I don't know.

"Q42 What I am getting at is you know the property is zoned agricultural?

"A    Yes, sir, it was zoned agricultural.

"Q43 There's quite a difference between the price [of] agricultural land and commercially zoned land?

"A    Yes."

Later Lavender admitted that Harris did not settle for the property until the Occupancy Certificate had been issued.

It is quite remarkable that there is not a shred of evidence of how many "thousands of dollars" Harris spent, or on what they were spent, and neither an intimation of the price Harris paid for the property, nor an opinion of its value if it be limited to agricultural use. The proof before us fell far short, under our decisions, of sustaining Harris' claim of a vested right. In *Ross v. Montgomery County*, 252 Md. 497, 250 A. 2d 635 (1969), $56,000 had been spent in architect's fees in reliance on a building permit which was nullified by a zoning change; in *Mayor & C.C. of Baltimore v. Shapiro, supra*, 187 Md. at 634, nine cars had been towed to a lot and dismantled; and in *Board of County Comm'rs of Anne Arundel County v. Snyder*, 186 Md. 342, 46 A. 2d 689 (1946), "several thousand dollars" had been spent on grading and landscaping. In all three cases, we held that the expenditure or change in position raised no estoppel. To rely on estoppel, Harris would have had to show substantial prejudice. This he has failed to do.

*Decree affirmed, costs to be paid by appellants.*

BARNES, J., dissenting:

I dissent because in my opinion (1) the majority is in error in concluding that there was no non-conforming

use; (2) the trial court was clearly in error in concluding that there was an abandonment of the non-conforming use it assumed, *arguendo,* to have validly existed; and, (3) in any event, there was sufficient evidence to establish an estoppel against the County from revoking the Occupancy Certificate.

## (1)

It should be pointed out, *in limine,* that the trial court *never decided* that no valid non-conforming use existed. It decided the case primarily on the ground that the nonconforming use—assuming without deciding that it validly existed—had been abandoned. In its opinion, the trial court stated:

> "The first comprehensive zoning ordinance for the Fourth Election District in which the subject property is located became effective July 25, 1950. The first comprehensive zoning ordinance covering all of Anne Arundel County was adopted July 1, 1952. There is some question in the court's mind as to which of these two dates should be regarded as the critical date with respect to nonconforming uses. However, for the purposes of this case it is not necessary to decide which date is the decisive one for even assuming July 25, 1950 to be the correct date, and further assuming, without deciding, that a nonconforming use for a used car lot and salvage yard existed on that date, the evidence is clear that such use was abandoned for much more than a year prior to the filing of the instant suit."

The majority, however, although stating that there was substantial evidence to support the chancellor's considering that there had been an abandonment of the use, takes the position that "the issue is not necessarily whether the non-conforming use was abandoned, * * * but rather whether the property was being used for any non-agricultural purpose on the date the first zoning ordinance be-

came effective, whether it be 25 July 1950, as the court assumed, * * * or 1 July 1952, when the first comprehensive ordinance became effective for the entire County, as the County contended * * *." It is clear to me that the Chancellor did not decide this issue below, that his eight findings of fact do not address themselves specifically to the non-existence of any use of the subject property for a used car lot and salvage auto garage on the critical dates, and that the evidence in the record indicates that there was such a use on those dates.

Before discussing the testimony before the lower court, I should state that I have grave doubts that this Court should decide the question of the *existence* of the non-conforming use in view of the fact that the lower court did not *decide* it. Maryland Rule 885 provides in part as follows:

> "This Court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court; * * *."

Not only does the record fail to show that this issue was decided by the lower court, but the record plainly shows that *it was not decided* by the trial court.

See *Higgins v. Mayor and City Council of Baltimore*, 206 Md. 89, 101, 110 A. 2d 503, 509 (1955) and *Hare v. Mayor and City Council of Baltimore*, 200 Md. 477, 486, 90 A. 2d 217, 221 (1952).

Assuming, *arguendo*, that the issue is properly before this Court, it appears to me that the testimony established and the Chancellor found that the former owner, Lavender, "conducted an extensive auto junk and salvage business on the property from about 1940 until 1945" and that because of a federal order he had "disposed of *practically all* of the used and junked cars * * * in 1946 or 1947." During that period, between 1945 and 1947, Lavender erected on the property a quonset hut and a cinder block building in which he stored old auto parts. The erection of these buildings for commercial purposes and their

actual use with the surrounding land for those purposes, in an otherwise agricultural area, was notice to the surrounding property owners and to the public generally that the land was being devoted by its owner to a commercial use. See *Feldstein v. LaVale Zoning Board*, 246 Md. 204, 227 A. 2d 731 (1967), and cases therein cited, and *Roach v. Board of Zoning Appeals*, 175 Md. 1, 199 A. 812 (1938).

Hugh M. Proutt, who has lived in the neighborhood of the subject property since 1952 and who was familiar with the subject property in 1939 and thereafter, described the use of the property in 1939 for selling used cars and parts. He testified the property had a hundred and fifty or two hundred cars on it at one time or another. "They were all back in the woods." Lavender "phased out during the war [World War II]." In 1950, Lavender had reduced the number of automobiles "to four or five cars he had left there sitting down back in the woods." The quonset hut, erected in possibly 1945 or 1946, was used by Lavender to keep "some used parts in there and his wife kept the tractors in there, and wagons, different stuff." The cinder block garage, built prior to 1947, "had used parts in there, tires. I think the Chaney Lumber Company rented it for a while to grease and change oil in their trucks and tractors and repair them there." In further explanation of the use of the subject property in 1950 Mr. Proutt stated: "Well I don't think he had over two, three or four back there, but I know he had a couple of tractors and he had old fencing and used wagons back there, and he had the garage filled up with tires and parts and in fact I rented part of a locker in there, freezer locker in there." When Lavender leased the property to Mitchell Harris in 1963 or 1964, Lavender "had one or two [vehicles] down in the woods behind the garage. I know he had an old packard there for a long time. I know he had another tractor that sat out front there that he finally sold to somebody back on Evergreen Road. "The concrete garage was used regular for parts in there." From 1947 until the Mitchell Harris lease, Lavender had "quite a few scattered around there. Some behind—in fact he had a

scale built out on the side of Route 3—301, that was in front of the place and he had stuff in there, he used until the road come by in 1958 and he had to tear that down. * * * he put it [the scale] there to * * * weigh the junk but I don't think he ever got the scale put in, it was a scale house." In reply to a question, "So far as you know did Mr. Lavender ever cease operations on that premises," Mr. Proutt answered, "Not as I know of, no." He also testified that Lavender continued to use the buildings for automobile parts. "He bought cars and take [took?] parts off them and sold them, kept the tires and whatever good parts there were on the later model cars."

Lawrence W. Chaney, who had rented the cinder block building from Lavender from 1946 to 1948 and who was generally familiar with the subject property, testified that he used the building for a maintenance shop and that Lavender from 1948 forward had two or three vehicles scattered on the property and other "stuff" he had bought from the Government. He testified:

> "He [Lavender] had bought the stuff that re-sembled, I don't know what they really were, they just resembled gates, and had some stuff he had bought from the Navy. I think he had some machinery, some lathes and stuff like that, stored in the building, stuff that he had to be sold, machinery. There was lathes, a press and stuff like that."

Vernon Hardesty, in the crane rental business who lives approximately three miles from the subject property, used to help Mr. Lavender in his scrap business before he joined the Army in 1950. He helped to build the quonset hut. In 1948 he worked for Lawrence Chaney and greased trucks in the concrete block building. Hardesty testified that Chaney

> "used it to grease trucks and to service trucks and they also had a mechanic there. His name was Thomas, Lawrence Thomas or Lowell

Thomas. I don't recall his first name. He had, also had the parts there in the quonset hut. He had tires. As a matter of fact I got a few tires from him. I bought some tires from him out of that shed."

He visited Mr. Lavender in 1954 after he had been discharged from the service, and he observed that there were automobiles parked in front of the quonset hut and beside the house. He signed a "petition" for Mitchell Harris in the early 1960's "stating that this was a property being used for automotive service."

John H. Hamilton, whose property adjoins the subject property, testified that in 1941 he asked Mr. Lavender for a job and was given one tearing down motors and taking crank shafts out of motors. When Mitchell Harris became tenant there were four cars on the property—"an old Buick, a Mercury and a Ford, and a Chevrolet, because I went to Lavender to buy the wheels off. I wanted to put them on a pickup truck and Mr. Lavender say he couldn't sell it to me." Some of the cars were down in the woods. There was a "20-30 tractor down there, and old, old one," and there was "a caterpillar there, an old '50 caterpillar." There were also "a lot of old parts and stuff * * * scattered around there."

Edward C. Lavender, who operated the Arundel Salvage Company at the subject property, testified in regard to his operations on the subject property. In 1943 he had about 90 cars on the place; in 1944 about 20 or 30; and, in 1945, 1946 and 1947 about seven. In 1949 he gave two of the cars to someone to get them out of the way. In 1950 he thought there were three or four cars there. They were located back of the garage. In addition to the cars he had other items on the subject property, *i.e.*, "* * * government aerials, or something. We sold them as gates and I bought quite a lot of stuff, of that surplus government stuff, and I had in the garage a lathe, a milling machine, drill press, and a power saw that I bought at government surplus, and something else. I just

don't remember what it was. Oh, it was two lathes. There was a bench lathe and a big, I think it was a twelve inch length or ten inch length, and the other one was about six inch length." He built the quonset hut and the cinder block building around 1945 or 1947. In 1950 and thereafter "if somebody would come and want to sell his car or something, I would buy it off him." He recalled buying a mobile crane from Byrd Brothers Company, as well as a shear to cut iron and sold some scrap metal to them around 1952 or 1955. He recalled advertising in the paper to sell the gates for $1.00 or $1.50 a piece. The last sale of scrap iron to Byrd Brothers Company was between 1957 and 1960. During the tenancy of Chaney Lumber Company of a portion of the cinder block building, used for repair work on trucks, Mr. Lavender used the other stalls for storing "some tires and a few motors and generators and starters and carburetors and I don't know what all." In the quonset hut there were stored "motors, tires and heads a few rear ends and different things like that." While Mitchell Harris was tenant, Lavender sold a bulldozer, trailer and truck from the subject property and bought one or two cars and sold them to Harris. He testified that he procured the occupancy permit on advice of an attorney when "Harris was getting his license. . . ."

Verni Gregg Burgone, manager for Harris, testified that when he first went on the subject property, after the company assumed control of it, "there were some vehicles around the back . . . I had to go down and clear off the property—"

The witnesses for the County, in my opinion, did not establish the nonexistence of the non-conforming use or the cessation or abandonment of it. Charles O. Smith, an investigator for the County Planning and Zoning Office, who lives some three miles from the subject property stated that between 1948 or 1949 and 1953 or 1954—a five year period—he observed no activity whatever on the subject property. When asked if he noticed any vehicles on the property, however, he stated "There may have been

some farm tractors or may have been a couple of vehicles that wasn't in view, but I never observed any on the property." When asked on cross-examination in regard to what was in the quonset hut and cinder block building, he stated "I never was in either one therefore I wouldn't know." When asked if he had seen the old vehicles back of the quonset hut down in the ravine, he said he did not see any, but admitted he had never walked over the property through the woods.

Russell C. Turner testified he had not seen radiators, tires, batteries and parts on the subject property or any fencing or war surplus materials, but he had never walked in the ravine or behind the quonset hut.

In summary, the overwhelming weight of the evidence establishes the fact that the subject property was used for a salvage or junk yard at the time of the critical dates necessary to establish a non-conforming use, and the weak negative evidence produced by the County was of little value in view of the admissions that the County's witnesses had not been on the subject property and thus would have been unable to see the old automobiles, parts, gates, etc., in the buildings and wooded ravine. As I have already observed, the lower court made *no finding* that a non-conforming use had not been established (it was assumed, *without deciding,* that one did exist) ; in my opinion, if such a finding had been made, it would have been clearly in error.

The majority states: "There was evidence to support a finding that no such use existed on either of these dates [July 25, 1950 or July 1, 1952]. A mere intention to use is not enough to establish a non-conforming use. *Chayt v. Bd. of Zoning Appeals,* 177 Md. 426, 9 A. 2d 747 (1939) ; *Beyer v. Mayor & C.C. of Baltimore,* 182 Md. 444, 34 A. 2d 765 (1943)." I have been unable to find sufficient evidence to support such a finding and, in any event, the trial court made no such finding as I have already stated. The majority is correct in stating that a *mere intention* is not enough to establish a non-conforming use, but there was far more in the present case than a mere intention. Mr.

Lavender not only continually stored old automobiles, gates, parts, etc., on the open premises and sold them from time to time, but prior to 1950 he erected the quonset hut and the cinder block building in which prior to, at and after the critical dates (cited by the majority) he stored parts, tires, etc., and also sold them from time to time. In my opinion, these were ample manifestations of Mr. Lavender's intention to use the subject property for the non-conforming purposes on the critical dates. The facts in the present case distinguish it, in my opinion, from the *Chayt* and *Beyer* cases relied on by the majority. In *Chayt*, vacant land, owned by the Maryland Jockey Club and held for the intended future expansion of a stable, was unused and unimproved when the City of Baltimore enacted a zoning ordinance placing the vacant land in a residential use district. A majority of the Court (three judges dissenting) held that under the provisions of the Baltimore City Zoning Ordinance there was no "existing use" to give the vacant (and unused) land the status of a non-conforming use. Chief Judge Bond, for the majority of the Court in *Chayt*, quoting from the opinion of the Supreme Court of Pennsylvania in the *Appeal of Haller Baking Co.*, 295 Pa. 257, 261, 145 A. 77, 79, stated:

> " 'As understood in the ordinance 'existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose; *i.e.*, the conduct of business.' "

It would be difficult to find a more effective way to make known to the community the non-conforming character of the use of the subject property than to store and sell used automobiles, tires, gates, and other salvage materials on the land itself and to erect *two* intended commercial buildings—a quonset hut and cinder block building—on the premises which were actually used for the storage and sale from time to time of automobile parts, tires and miscellaneous articles of like nature.

The *Beyer* case did not involve the establishment of a

non-conforming use which had clearly existed when the Baltimore City Zoning Ordinance was passed in 1931. The question in *Beyer* was whether the non-conforming use had been abandoned in 1938. I will consider this case more fully later in this opinion on the question of the alleged abandonment of the non-conforming use.

The present case has certain similarities to *Nyburg v. Solmson,* 205 Md. 150, 106 A. 2d 483 (1954). In *Nyburg,* there was an attempt by the Board of Municipal and Zoning Appeals of Baltimore City to limit the non-conforming use of an open space in front of the owner's garage to the storage of 10 vehicles, the use allegedly made of the open space when the Baltimore City Zoning Ordinance was passed. This restriction was struck down by the Baltimore City Court on appeal from the Board's decision and this Court affirmed the order of the Baltimore City Court. Judge (now Chief Judge) Hammond stated for the Court, after reviewing the evidence:

> "The evidence fully supports a finding that the use was continuous, substantial and commercial. The use meets the test adopted in *Chayt v. Board of Zoning Appeals,* 177 Md. 426, 434, of an existing use; that is to say, the utilization of the premises so that they are known in the neighborhood as being employed for the conduct of a given business."
> (205 Md. at 159, 106 A. 2d at 487).

See also *Feldstein v. LaVale Zoning Board,* 246 Md. 204, 227 A. 2d 731 (1967), *supra; Higgins v. City of Baltimore,* 206 Md. 89, 110 A. 2d 503 (1955), *supra; Hare v. Mayor and City Council of Baltimore,* 200 Md. 477, 90 A. 2d 217 (1952), *supra; Amereihn v. Kotras,* 194 Md. 591, 71 A. 2d 865 (1950); and, *Roach v. Board of Zoning Appeals,* 175 Md. 1, 199 A. 812 (1938), *supra.*

### (2)

In my opinion, the lower court was clearly in error in holding that there had been an abandonment of the non-

conforming use. The landmark case on abandonment of a non-conforming use is *Landay v. Board of Zoning Appeals,* 173 Md. 460, 196-A. 293, 114 A.L.R. 984 (1938). That case involved properties on Greenmount Avenue in Baltimore City used for a junk business when the Baltimore City Zoning Ordinance was passed, but which thereafter were vacated for three years when the junk use was discontinued. The appellant Landay then renewed the junk use and demanded and was refused a certificate of occupancy for this use by the Zoning Commissioner, who was affirmed by the Board of Zoning Appeals. In reversing the Baltimore City Court's order sustaining the Board, this Court stated:

> "Abandonment in law depends upon the concurrence of two, and only two, factors; one an intention to abandon or relinquish; and two, some overt act, or some failure to act, which carries the implication that the owner neither claims nor retains any interest in the subject-matter of the abandonment. 1 *C.J.S. Abandonment,* 8. Time is 'not an essential element' of abandonment, although the lapse of time may be evidence of an intention to abandon (*Id.,* 9, 16), and where it is accompanied by acts manifesting such an intention it may be considered in determining whether there has been an abandonment. Nor is mere non-user evidence of abandonment unless it continues for the statutory period of limitations of actions to recover the right or property. *Id.,* 16. It is said too that: 'It is a universally accepted principle that mere non-user of property over a period of time, when unaccompanied by any other acts indicating an intention to relinquish or abandon title thereto or ownership thereof, does not amount to an abandonment.' 1 *C.J.S.* 10."

(173 Md. at 469-70, 196 A. at 297).

It should be pointed out that the applicable ordinance

in the instant case provides that "in case of the abandonment of such nonconforming use for a period of one year, the right to continue such original nonconforming use shall cease." Thus, there is a one year period instead of a three year period (the period of the Statute of Limitations) mentioned in the quotation from *Landay, supra.*

*Landay* was cited with approval and followed by this Court in *Beyer v. Mayor and City Council of Baltimore,* 182 Md. 444, 34 A. 2d 765 (1943), *supra.* Judge (later Chief Judge) Marbury quoted in the opinion in *Beyer* the above quoted portion of the opinion in *Landay.* In the *Beyer* case, the Court found that there had been an abandonment of a nonconforming slaughterhouse use when the owner had sold all of the visible machinery, including boilers, pipes used for refrigeration and machinery for moving carcasses from one part of the plant to another; had taken down the smokestack—a necessary part of the building to be used for slaughtering and meat packing; and had made no attempt to replace the smokestack or the machinery. These facts, unlike those in *Landay* and the present case, were inconsistent with an intention to continue the non-conforming use.

The present case, involving a use similar to that involved in *Landay,* is, in my opinion, a far stronger case for the appellant on the facts than was the *Landay* case. In the instant case it is clear that Mr. Lavender had *no intention* whatever to abandon the non-conforming use and that at *no time* was there a *cessation* of the non-conforming use, although the *intensity* of that use varied from time to time depending upon economics and other conditions. Indeed, a temporary total discontinuance of the non-conforming use does not result in its abandonment. *Feldstein v. LaVale Zoning Board, supra, Landay v. Board of Zoning Appeals, supra.* The testimony, already considered in detail, certainly demonstrates that neither essential element of abandonment exists in the present case, and the trial court was clearly in error in finding an abandonment of the non-conforming use.

## (3)

I am of the opinion that there was sufficient evidence in the present case to estop the County from revoking the Occupancy Certificate issued on April 24, 1964, to the Harris Used Car Company to use the subject property as "a used car lot and salvage auto garage."

We have recently reviewed the law in regard to when, in zoning cases, a municipality may be estopped from interfering with a use after it has issued a valid permit for that use in *Richmond Corp. v. Board of County Commissioners for Prince George's County*, 254 Md. 244, 255 A. 2d 398 (1969), so that it is not necessary to do more here than to refer to the opinion in that case for the law applicable to the present case. A conflict among legal authorities revolves around whether money spent or other substantial change in position taken in good faith in *anticipation* of obtaining a permit, but before a permit is issued, can be considered as sufficient prejudice to estop the municipality, *or* whether the permit must have been issued prior to the expenditure or other substantial change in position. The latter view is the present majority view and the Maryland view. The minority position is, however, increasing in the number of jurisdictions adopting it.

In *Richmond Corporation*, all of the expenditures of the applicant in assembling the land and preparing the plans and specifications were incurred before the application for the permit was filed. The same situation existed in the cases cited by the majority in support of its position that Harris had not shown substantial prejudice. In *Ross v. Montgomery County*, 252 Md. 497, 250 A. 2d 635 (1969), the applicants had spent some $56,000 in an architect's fee in preparation for construction pursuant to a permit issued to them, but they permitted the permit to expire by not beginning construction in time. In the meantime the zoning law had been amended so as to prohibit the proposed use. We made it clear that in *Ross* there was no revocation of a valid permit by the municipality. We stated:

In reaching our conclusion in this case, al-

though we are aware that a substantial sum has been spent on planning, we are mindful that this is not a situation where a valid and subsisting permit has been revoked by operation of an ordinance which effected a rezoning repugnant to the use for which the permit had been issued. In the case at bar, the permit, which the planning was intended to complement, expired for want of performance, and with that expiration any vested right, which may have existed, became forfeit." (252 Md. at 506-07, 250 A. 2d at 640-41).

The implication is that *if there had been such an attempted revocation* there may well have been an estoppel from interference with a vested right.

In *Mayor & City Council of Baltimore v. Shapiro*, 187 Md. 623, 51 A. 2d 273 (1947), subsequent to an issuance of a permit, five cars were on one day towed to a vacant lot and dismantled a few weeks later. The parts and scrap were removed, and sometime later four more cars were towed to the lot for storage. This Court stated that the "activity appears to have been merely preliminary or casual" and did not amount to the commencement of work on the lot or the necessity of substantial expenditure based on faith in the permit sufficient to create a vested right.

In *Board of County Commissioners of Anne Arundel County v. Snyder*, 186 Md. 342, 46 A. 2d 689 (1946), the "several thousand dollars" spent in grading and landscaping had been spent prior to the filing of the application for the intended use. Unfortunately, this use was prohibited by adoption of a zoning ordinance a few days after the application was filed. No permit was ever issued by the zoning authorities in Anne Arundel County.

In the case at bar, however, the evidence is clear that Harris spent "several thousands of dollars" *subsequent to the obtention of the permit*. This is uncontradicted evidence, as is the evidence that Harris disposed of its entire business in Baltimore City and moved it down to the

subject property. Counsel for Harris wrote to the Zoning Offices on January 27, 1966, protesting against the refusal to reissue the Certificate of Occupancy theretofore revoked, and stated:

> "As you are probably aware, Harris purchased the property on Route No. 3, Gambrills, Maryland for the express purpose of operating a Used Car & Salvage Yard. Authorization and approval was obtained from the County prior to the settlement and based on the issuance of the aforesaid Certificate; Harris *moved his place of business, advertised his new location* and *cultivated new customers* at a *great deal of expense, time and trouble.*
>
> "Moreover, the refusal to reissue the Certificate *will cause Harris* Used Car & Salvage Yard, Inc. *to go out of business.* Therefore, it is my opinion that the denial of the Certificate by the County is without cause or justification. To that end, I would appreciate it if you would have your office again review this matter with the hope of reissuing the Certificate." (Emphasis supplied.)

This letter was introduced into evidence without objection as Plaintiff's Exhibit No. 7. The majority indicates that there was no specification of the amount of money spent and what specifically it was spent for, but, in my opinion, there was sufficient evidence to show that the amount was substantial and that it was spent in reliance on the issuance of the permit. Cross-examination was available to the County if specificity was desired, but there was no cross-examination in regard to these items.

The testimony of Mrs. Marion J. McCoy, Planning and Zoning Officer of the County and a witness for the County, was that the use of the subject property in Harris' business was substantial. As a result of her personal investigation of the subject property the morning of the trial, she testified that she noticed "various sundry of inoperable wrecks or junked vehicles, passenger vehicles, com-

mercial vehicles of all types, buses, parts are laying a sundry throughout the area to the rear. * * * it's well occupied." In regard to the lower land in the rear, she stated "It appears that, if I were making an educated guess, I would say its pretty much a hundred per cent used. . . ." Later she testified:

> "You can probably see fifty to a hundred feet in here but your visibility is limited because of the height of the trucks and the buses more than anything. You can see that [sic] are there. For instance the back truck, the back ones were Jacobs, some sort of panel truck. I couldn't see on the other side of those. It could have been single passenger automobiles behind that. They are stacked. When you get to the house area it's just a miscellaneous, a sundry of cars parked all different ways. You can't look beyond, you know a certain eye level there. And around the garage were all the—sat right immediately to the road were all the blocks and engines and everything. I think you get so interested in seeing what he has got there that I didn't really attempt to see any more depth to the operation at that point."

Is is obvious from the testimony that this is a substantial business operation involving a large number of automobiles, buses, trucks and parts. This operation is no "preliminary and casual" dismantling of five cars or temporary storage of four cars as were involved in the *Shapiro* case.

In summary, Harris, in my opinion, by the testimony mentioned made a prima facie showing of "substantial prejudice" and this was not rebutted by the County.

There is no suggestion that the Occupancy Certificate was issued as a result of fraud or any other impropriety. There is a "strong presumption" that the zoning officials having the responsibility for the Occupancy Certificate acted properly and regularly in issuing it. See *Lerch v. Maryland Port Authority,* 240 Md. 438, 457, 214 A. 2d

761, 771 (1965), and prior Maryland cases therein cited. There is no evidence in the case which would rebut the presumption. For the zoning officials to wait for some 20 months to seek to revoke the Occupancy Certificate adds the element of substantial delay, with its obvious injury to Harris if forced to remove its business after its operation of that business on the subject property for so long a time as a part of the estoppel of the County.

I would reverse the decree of March 6, 1969, of the lower court in its entirety and require the County, as appellee, to pay the costs.